PD-1636-14
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 1/21/2015 12:12:41 PM
Accepted 1/22/2015 4:04:00 PM
ABEL ACOSTA
CLERK

No. PD-1636-14

# In the Court of Criminal Appeals of Texas

WALTER DEMOND,
                    *Petitioner*,

v.

THE STATE OF TEXAS,
                    *Respondent.*

Petition in Cause No. CR-1016 from the
County Court at Blanco County, 424th Judicial District and
Cause No. 03-11-00553-CR from the
Texas Court of Appeals for the Third District, at Austin

**PETITION FOR DISCRETIONARY REVIEW**

FILED IN
COURT OF CRIMINAL APPEALS

January 22, 2015

ABEL ACOSTA, CLERK

James C. Ho
*State Bar No. 24052766*
Kyle Hawkins
*Motion for Admission Pro Hac Vice Pending*
Prerak Shah
*State Bar No. 24075053*
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201-6912
Tel.: (214) 698-3264
Fax: (214) 571-2917
*jho@gibsondunn.com*

COUNSEL FOR PETITIONER

**Oral Argument Requested**

To the Honorable Court of Criminal Appeals of Texas:

Petitioner Walter Demond respectfully petitions the Court to review and reverse the Court of Appeals for the Third District's judgment affirming his convictions for misapplication of fiduciary property and money laundering.

## IDENTITY OF JUDGE, PARTIES, AND COUNSEL

### A. Trial Court

This case was heard in the District Court of Blanco County, 424th Judicial District, No. CR-1016, before the Honorable Daniel H. Mills.

### B. Parties to the Judgment

The appellant is Walter Demond, an individual. The appellee is the State of Texas.

### C. Names and Addresses of Trial Counsel

| *For Walter Demond:* | *For the State of Texas:* |
|---|---|
| E.G. (Gerry) Morris<br>LAW OFFICE OF E. G. MORRIS<br>608 West 12th Street, Suite B<br>Austin, Texas 78701<br>Tel.: (512) 478-0758<br>egm@egmlaw.com | Harry White<br>Deputy Attorney General<br>OFFICE OF THE ATTORNEY GENERAL<br>P.O. Box 12548, Capitol Station<br>Austin, Texas 78711-2548<br>Tel.: (512) 463-2529 |
| Warren L. "Rip" Collins<br>MINTON, BURTON,<br>BASSETT AND COLLINS<br>1100 Guadalupe St.<br>Austin, Texas 78701<br>Tel.: (512) 476-4873<br>rcollins@mbfc.com | Tom Cloudt<br>Deputy Attorney General<br>OFFICE OF THE ATTORNEY GENERAL<br>P.O. Box 12548, Capitol Station<br>Austin, Texas 78711-2548<br>Tel.: (512) 463-2170 |

## D. Names and Addresses of Appellate Counsel

| *For Walter Demond:* | *For the State of Texas:* |
|---|---|
| James C. Ho<br>GIBSON, DUNN & CRUTCHER LLP<br>2100 McKinney Avenue<br>Suite 1100<br>Dallas, Texas 75201-6912<br>Tel.: (214) 698-3264<br>jho@gibsondunn.com<br><br>Daniel L. Geyser<br>MCKOOL SMITH<br>300 Crescent Court, Suite 1500<br>Dallas, Texas 75201<br>Tel.: (214) 978-4014<br>dgeyser@mckoolsmith.com<br><br>E.G. (Gerry) Morris<br>LAW OFFICE OF E.G. MORRIS<br>608 West 12th Street, Suite B<br>Austin, Texas 78701<br>Tel.: (512) 478-0758<br>egm@egmlaw.com<br><br>Warren L. "Rip" Collins<br>MINTON, BURTON,<br>BASSETT AND COLLINS<br>1100 Guadalupe St.<br>Austin, Texas 78701<br>Tel.: (512) 476-4873<br>rcollins@mbfc.com | Jessica M. Manojlovich<br>Assistant Attorney General<br>Postconviction Litigation Division<br>OFFICE OF THE ATTORNEY GENERAL<br>P.O. Box 12548, Capitol Station<br>Austin, Texas 78711-2548<br>Tel.: (512) 936-1400<br>jessica.manojlovich@texasattorneygeneral.gov<br><br>Dustin Howell<br>Assistant Solicitor General<br>Office of the Attorney General<br>P.O. Box 12548 (MC 059)<br>Austin, Texas 78711-2548<br>dustin.howell@texasattorneygeneral.gov |

# TABLE OF CONTENTS

**Page**

IDENTITY OF JUDGE, PARTIES, AND COUNSEL ............................................................ ii

TABLE OF CONTENTS ..................................................................................... iv

INDEX OF AUTHORITIES.....................................................................................v

STATEMENT REGARDING ORAL ARGUMENT ......................................................... viii

STATEMENT OF THE CASE ............................................................................... viii

STATEMENT OF PROCEDURAL HISTORY .................................................................x

QUESTIONS PRESENTED FOR REVIEW .................................................................. xi

ARGUMENT ....................................................................................................1

I.   A corporate executive does not commit the crime of misapplication when he acts in accordance with explicit authority from his employer. ...............................................................3

   A.   The misapplication statute's plain text precludes liability when the principal has authorized the fiduciary's actions. ...................3

   B.   The decision below criminalizes ordinary business practices better redressed in the civil arena.........................................11

II.  An outside attorney may not be convicted for a corporate executive's misapplication of fiduciary funds under the law of parties when the attorney facilitates a transaction he believes to be lawful. ........................................................................12

   A.   Binding law-of-parties doctrine requires proof beyond a reasonable doubt that the secondary actor knows he is facilitating a crime.......................................................13

   B.   The decision below will fundamentally alter the attorney-client relationship in Texas. ...............................................16

PRAYER FOR RELIEF .........................................................................................19

**Cases**

*Amaya* v. *State*,
733 S.W.2d 168 (Tex. Crim. App. 1986).......................................................... 13, 15

*Berry* v. *State*,
424 S.W.3d 579 (Tex. Crim. App. 2014)................................................. 3, 4, 11, 12

*Boykin* v. *State*,
818 S.W.2d 782 (Tex. Crim. App. 1991).................................................................3

*Bynum* v. *State*,
767 S.W.2d 769 (Tex. Crim. App. 1989).................................................................4

*Cates* v. *Sparkman*,
11 S.W. 846 (Tex. 1889)..........................................................................................9

*Conrick* v. *Houston Civic Opera Ass'n*,
99 S.W.2d 382 (Tex. Civ. App.—Amarillo 1936, no writ).....................................9

*Demond* v. *State*,
— S.W.3d —, 2014 WL 661251013 (Tex. App.—Austin, Nov. 21, 2014,
pet. filed) ....................................................................................................... *passim*

*Edwards* v. *State*,
956 S.W.2d 687 (Tex. App.—Texarkana 1997, no pet.).......................................16

*Ex parte Valdez*,
401 S.W.3d 651 (Tex. Crim. App. 2013).................................................................3

*Gearhart Indus., Inc.* v. *Smith Int'l, Inc.*,
741 F.2d 707 (5th Cir. 1984)...................................................................................9

*Hall* v. *Pedernales Elec. Coop., Inc.*,
278 S.W.3d 536 (Tex. App.—Austin 2009, no pet.) ............................................11

*In re C.H.C.*,
290 S.W.3d 929 (Tex. App.—Dallas 2009, no pet.)................................................9

*Kesaria* v. *State*,
189 S.W.3d 279 (Tex. Crim. App. 2006) ............................................................ xi

*Miller* v. *A. & N. R. R.R.*,
476 S.W.2d 389 (Tex. Civ. App.—Beaumont 1972, writ ref'd n.r.e.) ..................4

*Miller* v. *Am. Tel. & Tel. Co.*,
507 F.2d 759 (3d Cir. 1974) ................................................................................9

*Richardson* v. *State*,
879 S.W.2d 874 (Tex. Crim. App. 1993) ............................................................12

*Ritchie* v. *Rupe*,
443 S.W.3d 856 (Tex. 2014) ..............................................................................11

*Rourke* v. *Garza*,
530 S.W.2d 794 (Tex. 1975) ................................................................................4

*Schoellkopf* v. *Bryan*,
284 S.W. 339 (Tex. Civ. App.—San Antonio 1926, writ ref'd) .........................10

*Tiemeyer* v. *Quality Publ'g, Inc.*,
144 F. Supp. 2d 727 (S.D. Tex. 2001) ................................................................10

*United States* v. *D'Amato*,
39 F.3d 1249 (2d Cir. 1994) ........................................................................... 9, 15

*United States* v. *Harriss*,
347 U.S. 612 (1954) ............................................................................................15

**Constitutional Provisions**

Tex. Const. Art. I, § 19 ........................................................................................15

U.S. Const. Amend. V ...........................................................................................15

U.S. Const. Amend. XIV .......................................................................................15

**Statutes**

Tex. Code Crim. Proc. art. 42.12, § 12(a).............................................................. xi

Tex. Penal Code § 32.45 ............................................................... 3, 6, 7, 11, 12, 18

Tex. Penal Code § 32.45(a)(2) ...............................................................................4

Tex. Penal Code § 32.45(b) ....................................................................................4

Tex. Penal Code § 7.02 ................................................................................... 13, 18

**STATEMENT REGARDING ORAL ARGUMENT**

Petitioner Walter Demond respectfully submits that this case merits oral argument. In adopting the State's novel reading of the crime of misapplication of fiduciary funds, the decision below dramatically expands criminal liability for everyday corporate conduct. It declares, for the first time in Texas, that any corporate executive who authorizes consulting and legal expenses will be guilty of a felony if a jury, reviewing on hindsight, feels he acted unwisely. Even worse, an outside lawyer who advises that executive also faces felony liability under the lower court's expansive reading of the law of parties, even if the lawyer does not suspect that the executive's conduct was unlawful. Petitioner respectfully suggests that oral argument would assist the Court's resolution of these issues.

**STATEMENT OF THE CASE**

For three decades, Walter Demond, a partner and head of the energy practice at the Austin law firm Clark, Thomas & Winters, PC, advised the Pedernales Electric Cooperative ("PEC"), a member-owned utility that provides electrical service to twenty-four counties in central Texas. Throughout that time, Demond worked at the direction of PEC's general manager, Bennie Fuelberg. Although all parties agree that Fuelberg had unfettered discretion as general manager to hire outside consultants and lawyers, the State in this case brought criminal charges against Fuelberg after it learned that he had hired his brother to consult on

viii

legislative matters, and the son of a PEC board member to provide legal advice under a retainer agreement. The State claimed these engagements were illegal because Fuelberg concealed them from some PEC employees, and because PEC did not receive sufficient value in exchange for the roughly $200,000 it allegedly overpaid these individuals over 11 years. In addition, the State charged Demond with first-degree misapplication of fiduciary property, first-degree theft, and second-degree money laundering, for acting on Fuelberg's instructions regarding these transactions.

At trial, Demond presented uncontroverted evidence that Fuelberg was authorized to hire whomever he wanted. He also presented undisputed testimony that he never suspected that Fuelberg's actions were criminal. The district court denied Demond's motion for a directed verdict and sent the matter to a jury, which returned a guilty verdict of second-degree misapplication, assessing a $10,000 fine and a suspended 10-year sentence; first-degree theft, assessing a $10,000 fine and a suspended 10-year sentence; and second-degree money laundering, assessing a $10,000 fine and a 10-year suspended sentence. The district court ordered restitution of $212,000 and imposed a 500-day jail sentence as a condition of community supervision. The court denied a motion for a new trial.

On appeal, the Third Court reversed Demond's theft conviction, but affirmed his convictions for misapplication and money laundering.

## STATEMENT OF PROCEDURAL HISTORY

The Third Court issued its opinion on November 21, 2014. Neither Demond nor the State sought rehearing in that court. *Demond* v. *State*, — S.W.3d —, 2014 WL 6612510 (Tex. App.—Austin, Nov. 21, 2014, pet. filed).

On December 15, 2014, Demond sought a 30-day extension of the deadline for filing this Petition. This Court granted that request on December 17, 2014.

## QUESTIONS PRESENTED FOR REVIEW

1.      Can a corporate executive permissibly be convicted of the crime of misapplication of fiduciary funds when he acts with explicit authority from his employer?

2.      Can an attorney permissibly be convicted for a corporate executive's misapplication of fiduciary funds under the law of parties for following his client's instructions regarding a transaction he believes to be lawful?

3.      **Unbriefed Issue.**  The State convicted Demond of misapplying property that Fuelberg held pursuant to Fuelberg's agreement with PEC, even though the State had actually indicted Demond for allegedly misapplying property that Demond held pursuant to Demond's own agreement with PEC.  The State also convicted Demond of money laundering based on the theory that the crime of misapplication occurred when the funds at issue were transferred to his law firm, even though the indictment actually alleged that the misapplication occurred when the funds were transferred to the outside consultants.  Did the court below err in determining that these variances between the allegations in the indictment and the prosecutor's actual case at trial were not material?

4.      **Unbriefed Issue.**  Did the court below err in holding that Petitioner's trial judge was not disqualified, and need not recuse, despite his personal and financial interest in the case, as set forth more fully in the Petition for Discretionary Review in No. PD-1537-14, *Fuelberg* v. *State* (filed January 12, 2015)?

5.      **Unbriefed Issue.**  This Court, in *Kesaria* v. *State*, 189 S.W.3d 279 (Tex. Crim. App. 2006), construed Texas Code of Criminal Procedure, art. 42.12, § 12(a), to permit consecutive jail terms as a condition of community supervision, but reached that conclusion without the benefit of full briefing as to the proper construction of that statute.  Does § 12(a) permit a jail sentence of 180 days per felony *case*, as the plain statutory language suggests, or per felony *count*, as the court below held in reliance on *Kesaria*?

The ruling below announces not one, but two dangerous precedents that should trouble businesses and lawyers across the State of Texas—as well as this Court.

First, this prosecution violates a rudimentary principle of criminal law: It is not a crime to use property with the owner's consent. In this case, a corporate CEO (Bennie Fuelberg) spent corporate funds on external legal and consulting expenses, with the assistance of his outside counsel (Walter Demond)—and with his corporation's consent. As the Third Court itself said, "[t]he undisputed evidence admitted at trial established that Fuelberg had broad authority to hire both PEC employees and outside consultants," "the evidence established that Fuelberg was not required to inform the PEC board or seek its approval before hiring outside consultants—including [the consultants at issue here]," and "none of the directors testified that the board would have stepped in and blocked these payments." *See Demond* v. *State*, — S.W.3d —, 2014 WL 6612510, at *6, *13 (Tex. App.—Austin, Nov. 21, 2014, pet. filed).

And yet the Third Court allowed Fuelberg and Demond to be prosecuted for misapplication, holding that the jury could have concluded that Fuelberg spent more than he should have—$5,000 per month, rather than $4,000. But the notion that a CEO and an outside attorney can be prosecuted because the government

1

disagrees on the pricing of legal and consulting services is absurd—and a troubling criminalization of everyday business activities. Fuelberg's conviction should have been reversed on this ground alone—and Demond's along with it.

But the case against Demond is doubly wrong. It is bedrock criminal law that an attorney cannot be convicted for facilitating a crime, unless the attorney knew he was facilitating *a crime*. Here, there was no evidence that Demond had any reason to doubt that Fuelberg, his client contact, had authority to spend the funds in question—and yet the Third Court still found Demond responsible for Fuelberg's alleged crimes, because Demond followed Fuelberg's instructions on how to bill for these expenses.

That cannot be right—and the consequences of the Third Court's ruling should worry every attorney in Texas. If the Third Court is right, then from now on, outside counsel can no longer rely on the mere approval of a CEO or general counsel to bill the company for particular expenses in a particular manner. Instead, the lawyer may need to confirm every billing practice with the company's board of directors—or perhaps the company's shareholders—or perhaps even state prosecutors. If he does not, he might go to jail when a prosecutor and jury decide that the legal bill was too high. That too is absurd.

The Third Court's opinion cannot be right. It conflicts with decisions of other courts of appeal and of this Court; it decides important questions of state law

that should be settled by this Court; and it misconstrues two statutes.  Pursuant to

Texas Rule of Appellate Procedure 66.3, this Court should grant this Petition for

Discretionary Review, reverse the judgment below, and order a judgment of

acquittal as to all counts.

**I.      A corporate executive does not commit the crime of misapplication when he acts in accordance with explicit authority from his employer.**

As a matter of statutory text and precedent—not to mention common

sense—a corporate executive does not commit the crime of misapplication when

he spends his company's funds with the company's *permission*, simply because a

prosecutor later decides that he spent too much on legal or consulting services.

And it follows *a fortiori* that if an executive has committed no crime, then his

outside lawyer could not have facilitated a crime.

**A.      The misapplication statute's plain text precludes liability when the principal has authorized the fiduciary's actions.**

The Third Court's decision runs afoul of the misapplication statute's plain

text, Texas Penal Code § 32.45, which this Court has declared must be interpreted

"in light of its plain meaning."  *Berry* v. *State*, 424 S.W.3d 579, 580 (Tex. Crim.

App. 2014) (reversing conviction for second-degree misapplication of fiduciary

funds due to insufficiency of evidence); *see also Ex parte Valdez*, 401 S.W.3d 651,

655 (Tex. Crim. App. 2013); *Boykin* v. *State*, 818 S.W.2d 782, 785 (Tex. Crim.

App. 1991) ("literal text" and its "fair, objective meaning" prevail).

3

Under the statute, a person "commits an offense if he intentionally, knowingly, or recklessly misapplies property he holds as a fiduciary." Tex. Penal Code § 32.45(b); *Berry*, 424 S.W.3d at 582-83. To "misapply" means to "deal with property contrary to an agreement under which the fiduciary holds the property." Tex. Penal Code § 32.45(a)(2). That provision "is quite clear in the conduct it proscribes," namely, handling the property "in contravention of an established duty[.]" *Bynum* v. *State*, 767 S.W.2d 769, 775 (Tex. Crim. App. 1989).

Of course, no one disputes that any CEO has the inherent authority to act for his corporation. *Cf. Rourke* v. *Garza*, 530 S.W.2d 794, 803-04 (Tex. 1975). Settled law provides that once a company delegates broad powers to its CEO, the CEO has the absolute right to exercise that power in his discretion. *E.g.*, *Miller* v. *A. & N. R. R.*, 476 S.W.2d 389, 394 (Tex. Civ. App.—Beaumont 1972, writ ref'd n.r.e.). And the uncontroverted record in this case, as summarized by the Third Court, confirms that those general principles governed PEC: The "undisputed evidence admitted at trial established that Fuelberg had broad authority to hire both PEC employees and outside consultants." *Demond*, 2014 WL 6612510, at *6. And there was "no evidence to indicate that any other PEC bylaw limited Fuelberg's authority to hire outside consultants." *Id*. Indeed, four out of PEC's seven voting directors—in effect, Fuelberg's superiors—testified at trial that

4

Fuelberg had unlimited authority to commit PEC funds to outside consultants and lawyers. *See* 10.RR.199-200; 12.RR.8-10; 13.RR.35-37; 13.RR.189-191.

Against that backdrop, the two engagements at issue in this prosecution were proper and unremarkable. First, Fuelberg hired his brother, Curtis Fuelberg, to provide outside legislative services during a time when "the Texas Legislature was in the process of deregulating electric utilities, which could have significantly impacted all utility cooperatives."[1] *Id*. at *8. Second, Fuelberg placed William Price, an attorney and the son of a PEC board member, on a legal retainer to provide advice as needed in connection with legal matters in the Lampasas, Texas, area.

The State apparently believed Fuelberg erred in hiring a board member's son and his own brother. But the Third Court rejected that notion, acknowledging that both engagements were permissible because even though "PEC generally discouraged hiring close relatives, the evidence established that Fuelberg was not required to inform the PEC board or seek its approval before hiring outside consultants—including Curtis and Price." *Id*. at *6. The court recognized that PEC's general policy discouraging nepotism did not cover the Curtis and Price engagements because "it is undisputed that Curtis and Price were outside

---

[1] This Petition refers to Curtis by his first name to avoid confusion.

consultants rather than PEC employees, and as such their salaries were not covered by the Nepotism Policy." *Id*.

The Third Court further recognized there was "no direct testimony to [the] effect" that "the PEC would have potentially reined in or revoked Fuelberg's authority to hire outside consultants had the PEC known that its funds were being paid to Curtis and Price." *Id*. at *12. Indeed, "none of the [PEC] directors testified that the board would have stepped in and blocked these payments. . . . [N]one of the directors testified that had they known that Curtis and Price were being paid through Clark Thomas, they would have recommended that the PEC's nepotism policy be modified to cover outside consultants. . . . [N]o witness testified that had either the PEC's accounting department or board of directors known about these payments, they would have considered terminating Fuelberg's employment or reining in his authority." *Id*. at *13.[2] Moreover, none of the evidence at trial suggested that Fuelberg "induced the PEC to make payments it otherwise would not have made." *Id*. at *14.

That background should have entitled Demond to a judgment of acquittal. But the Third Court dramatically erred, misreading § 32.45 in two important ways

---

[2] Four of PEC's seven voting directors—a clear majority—testified that Fuelberg had authority to hire Curtis and Price. *See* See 10.RR.199-200; 12.RR.8-10; 13.RR.35-37; 13.RR.189-191 (testimony of O.C. Harmon, Edwin Smith, Vi Cloud, and R.B. Felps). A fifth gave conflicting testimony, and the other two did not testify. The Third Court mistakenly suggested that only three of the voting directors testified at Demond's trial. 2014 WL 6612510, at *13.

6

that severely distort Texas law. First, it held improperly that Fuelberg's efforts to disguise the Curtis and Price engagements from the payroll department constituted "damning evidence" that "Fuelberg did not have the authority to make these payments to Curtis and Price." *Id*. at *7, *9. In other words, the Third Court concluded that when a fiduciary's course of conduct suggests that he might not be authorized to undertake a particular transaction, his behavior can defeat his actual authority. That proposition runs contrary to § 32.45's text, which speaks only to whether a fiduciary acts contrary to the agreement under which he holds the assets. Under § 32.45, it does not matter whether Fuelberg attempted to disguise the Curtis and Price engagements from PEC's accounting department staff. All that matters is whether he was actually authorized to engage Curtis and Price, and everyone agrees that he was. The Third Court's reliance on Fuelberg's subsequent conduct was therefore misplaced.[3]

Second, the Third Court held that an authorized expenditure may become unauthorized if a jury, with hindsight, determines that it was ill-advised or wasteful. Specifically, the court declared that these expenditures violated Fuelberg's duty, under his employment agreement, to "perform all of his duties

---

[3] In any event, the Third Court misread the trial evidence. The evidence showed that Fuelberg sought to obscure the Curtis and Price engagements from the payroll department to prevent a "morale issue." *Demond*, 2014 WL 6612510, at *13. Some employees, he feared, "might complain that Fuelberg was allowed to hire his relatives while other employees were not." *Id*.

7

properly and faithfully in the best interest of the PEC." 2014 WL 6612510, at *7.

But there is no "best interest of the company" rule anywhere in either the text of

the criminal misapplication statute, or in any other authority. Moreover, it is

frightening to imagine empowering jurors to convict an executive, simply because

they disagree (with the benefit of hindsight) on whether certain actions were or

were not in the best interest of his company. In other words, it transforms

boilerplate language in an employment contract into the basis of a felony

conviction at the hands of twelve jurors.

The flaws inherent in that approach are manifold. To begin with, the

decision below hinges *criminal* liability on a jury's second-guessing of a CEO's

commercial assessment of the value of intangible goods, such as services. But, as

even the Third Court conceded, the "value of professional services may be more

open to interpretation than the value of tangible goods whose fair-market price is

often readily identifiable." *Id*. at *8. That proposition "is even more true for

lobbying services or legal work because an individual lobbyist or lawyer may be

particularly valuable depending on his or her abilities, experience, and

relationships with relevant legislators or judges, factors that may be difficult for a

jury to evaluate." *Id*. There was ample evidence as to the qualifications, talent,

and relationships Curtis brought to PEC. And, as to the retainer paid to Price,

"there was testimony that having a lawyer on retainer has value regardless of

8

whether the lawyer ultimately performs any work." *Id*. Indeed, evidence at trial

showed that Price was an able lawyer qualified to work in the Lampasas area and

that he would forgo other engagements adverse to PEC's interests. *See In re

C.H.C.*, 290 S.W.3d 929, 932 (Tex. App.—Dallas 2009, no pet.) (retainer

agreement is earned the moment it is received because lawyer will lose other

employment due to the representation).

Moreover, it was not feasible at the time the engagements were made for

Fuelberg to have know what Curtis would ultimately be worth to PEC, or to

foresee which projects would materialize for Price in the Lampasas region. Of

course, that is doubly so as to Demond, an outside adviser.

The Third Court should have avoided these errors by applying the same

business judgment rule that shields corporate executives from liability for unwise

decisions in innumerable contexts. That rule reflects "the unanimous decision of

American courts to eschew intervention in corporate decision-making." *See Miller*

v. *Am. Tel. & Tel. Co.*, 507 F.2d 759, 762 (3d Cir. 1974); *see also Gearhart Indus.,

Inc.* v. *Smith Int'l, Inc.*, 741 F.2d 707, 721 (5th Cir. 1984); *Cates* v. *Sparkman*,

11 S.W. 846, 849 (Tex. 1889). Not only does the business judgment rule routinely

shield executives from civil liability for poor decisions, *e.g.*, *Conrick* v. *Houston

Civic Opera Ass'n*, 99 S.W.2d 382, 385 (Tex. Civ. App.—Amarillo 1936, no writ),

but it applies in the criminal context as well. *See, e.g.*, *United States* v. *D'Amato*,

39 F.3d 1249, 1258 (2d Cir. 1994) (relying on a business judgment rule to reverse the wire fraud conviction of lobbyist Armand D'Amato, who allegedly altered his bills for lobbying work to conceal his familial relationship with former U.S. Senator Alfonse D'Amato).

The business judgment rule would eliminate the hazards that come with putting jurors into the CEO office to make business decisions. Juries are well equipped to resolve issues of witness credibility, but courts have long held that other matters, including whether an executive exercised sound business judgment, are not suited to resolution by twelve lay persons. *See Tiemeyer* v. *Quality Publ'g, Inc.*, 144 F. Supp. 2d 727, 736 (S.D. Tex. 2001) ("[I]t is well established that the function of the courts and juries is not to impose their judgments on the business decisions of employers."). Texas courts recognize that the authority to make complex business decisions was delegated by the board to a highly trained executive, and *not* to a jury. *See Schoellkopf* v. *Bryan*, 284 S.W. 339, 343 (Tex. Civ. App.—San Antonio 1926, writ ref'd) (when a contract delegated all matters of business judgment to one person, that person alone had the authority to make business decisions; the delegation was not to "[the other party to the contract], nor to arbitrators, nor to juries"). A jury simply is not qualified to usurp Fuelberg's role as the architect of PEC's business plan.

The record shows that the Curtis and Price engagements were made for defensible business reasons, and that PEC received value from both. A jury cannot permissibly step into the corporate boardroom *post-hoc* and decide otherwise.

**B.      The decision below criminalizes ordinary business practices better redressed in the civil arena.**

The Court of Appeals' misreading of § 32.45 carries severe consequences for the Texas business community. As discussed, the Third Court has expanded the crime of misapplication in a way that allows juries to second-guess—with criminal consequences at stake—every unwise decision a corporate officer makes. PEC had many appropriate tools to remedy Fuelberg's questionable business decisions, including censure, termination, or even a civil lawsuit.[4] *See Ritchie* v. *Rupe*, 443 S.W.3d 856, 882 (Tex. 2014) ("[V]arious common-law causes of action already exist to address misconduct by corporate directors and officers."). Criminal prosecution should not be a viable option for everyday decisions that do not produce the hoped-for return on investment.

\* \* \*

Just a few months ago, this Court reaffirmed the importance of correctly interpreting § 32.45. In *Berry* v. *State*, 424 S.W.3d 579 (Tex. Crim. App. 2014), this Court reversed a conviction arising under § 32.45 due to insufficient evidence

---

[4] Indeed, Fuelberg's actions spawned civil litigation. In *Hall* v. *Pedernales Elec. Coop., Inc.*, 278 S.W.3d 536 (Tex. App.—Austin 2009, no pet.), PEC settled a variety of claims of mismanagement by a host of directors and officers. Demond was not named a defendant.

11

that the defendant in that case acted as a "fiduciary." *Id*. at 585-86. The Third

Court's decision below presents a similarly consequential misreading of Texas law,

and this Court's intervention is necessary. Correctly applying § 32.45, Fuelberg

never committed the crime of misapplication because he was authorized to make

the expenditures at issue in this case. Of course, without a primary actor, it follows

*a fortiori* that Demond cannot be criminally liable for the crime of misapplication

under the law of parties.[5] *See Richardson* v. *State*, 879 S.W.2d 874, 882 (Tex.

Crim. App. 1993) (en banc). The Court should grant this Petition, reverse

Demond's convictions, and enter a judgment of acquittal as to all counts.

## II. An outside attorney may not be convicted for a corporate executive's misapplication of fiduciary funds under the law of parties when the attorney facilitates a transaction he believes to be lawful.

Fuelberg committed no crime, but the prosecution of Demond is doubly

flawed, because separate and apart from Fuelberg's innocence, Demond cannot be

guilty under the Texas law of parties unless he knew he was facilitating *a crime*.

The Third Court's holding to the contrary contravenes this Court's binding

precedents and, if allowed to stand, will fundamentally alter the attorney-client

relationship in Texas.

---

[5] On January 12, 2015, Fuelberg filed a Petition for Discretionary Review in this Court, No. PD-1537-14. Because Demond's conviction under the law of parties cannot stand without Fuelberg's predicate offense, any relief this Court grants Fuelberg necessarily undermines the validity of Demond's conviction, and would necessitate at minimum vacatur of the Third Court's decision below.

**A.    Binding law-of-parties doctrine requires proof beyond a reasonable doubt that the secondary actor knows he is facilitating a crime.**

The Third Court misconstrued the governing standard under the law of parties.  The State must prove that Demond acted with intent to assist *a crime*—not just the intent to assist a transaction that, unbenownst to the defendant, is later determined to be a crime.  *See* Tex. Penal Code § 7.02.  This Court declared in *Amaya* v. *State*, 733 S.W.2d 168, 174 (Tex. Crim. App. 1986) (en banc), that to be liable of the crime of misapplication under the law of parties, the State must prove beyond a reasonable doubt that the defendant knew he was assisting a crime:

> [W]e cannot hold [agents] accountable as parties without some indication that they knew they were assisting in the commission of an *offense*.  Otherwise, criminal complicity would extend to all those who perform acts that happen to assist in a criminal undertaking, even though there was no knowledge that a crime was being assisted.  We require a higher level of complicity from those we denote parties than those we denote primary actors, because the former are performing acts that are not illegal in and of themselves; the acts only attract criminal liability because of the result they are directed to, the commission of a crime.

*Id*. (emphasis in original).  That standard controls this case.

The State presented evidence that Demond was told to conceal the Curtis and Price engagements through opaque billing procedures, but it could not and did not show that Demond knew Fuelberg's actions were *criminal*.  For his part, Demond presented evidence "that he believed Fuelberg had the authority to hire outside consultants of his choosing, that Fuelberg told him the PEC board was

13

aware of these hires, and that Curtis and Price provided real value to the PEC."
*Demond*, 2014 WL 6612510, at *2. With no evidence that Demond intended to facilitate a crime, and ample evidence that Demond was simply following the ostensibly proper billing instructions of PEC's highest executive, the Third Court should have granted Demond a judgment of acquittal.

What is more, if Demond had read every one of PEC's governing documents, they only would have confirmed his belief that Fuelberg had the authority to hire and fire anyone he wanted. Moreover, no document forbade the retention of outside consultants and lobbyists regardless of their familial relations to existing directors and officers. In short, nothing in PEC's governing documents would have put Demond on notice that he was facilitating a crime.

According to the theory below, the only document that could have put Demond on notice of criminal activity was Fuelberg's employment contract, which called for Fuelberg to act in PEC's best interests. It follows, then, that since Fuelberg's actions became criminal only because they contravened his employment agreement, Demond could have known he was facilitating *a crime* only if he was aware of the requirements of that specific agreement *and* knew at the time the engagements were made that hiring Curtis and Price contravened that agreement. All Demond knew, however, was that Fuelberg had authority to act, and that Fuelberg had assured him that the Curtis and Price engagements were in

14

PEC's best interests.  With no evidence to the contrary, those facts should have entitled Demond to a judgment of acquittal under the law set out in *Amaya*.  Indeed, it is well accepted that when an outside agent such as a lawyer contracts "to provide ordinary business or professional services to the corporation," the lawyer "may rely upon instructions from a corporate agent" as to "appropriate billing practices." *United States* v. *D'Amato*, 39 F.3d 1249, 1258 (2d Cir. 1994).

Rather than apply the proper standard of law, the Third Court held Demond liable because a jury, reviewing the Curtis and Price engagements *post-hoc* and with hindsight vision, heard evidence that PEC did not receive adequate value from the Curtis and Price engagements.  For the reasons explained in part I.A, *supra*, it was improper to find Fuelberg liable under that standard, but doubly impermissible as to Demond.  The Third Court required Demond to know at the time Fuelberg directed him to engage Curtis and Price that a jury would later determine that those engagements did not add sufficient value to PEC, even though at the time the engagements were made nothing in the record suggested Demond had any reason to doubt their propriety.  If that were the proper standard, it would abrogate the most basic notice requirement of the U.S. and Texas Constitutions' due process guarantees.  *See* U.S. Const. Amends. V, XIV; Tex. Const. Art. I, § 19; *United States* v. *Harriss*, 347 U.S. 612, 617 (1954) (recognizing the "underlying principle . . . that no man shall be held criminally responsible for conduct which he could not

15

reasonably understand to be proscribed"); *see also Edwards* v. *State*, 956 S.W.2d 687, 691 (Tex. App.—Texarkana 1997, no pet.) ("A defendant may not be held accountable as a party without some indication that they knew they were assisting in the commission of an offense."). No lawyer in Demond's position could have realized, or been expected to anticipate, that the transactions he assisted would turn out to be criminal.

**B. The decision below will fundamentally alter the attorney-client relationship in Texas.**

The Third Court's decision distorts the role that outside attorneys play in advising corporations. It makes that role both more difficult and more perilous.

If the decision below stands, every corporate lawyer will be forced to second-guess every instruction he receives from corporate managers that involves corporate expenditures. The lawyer will be required to look behind every command and, in some cases, refuse to follow even a CEO's instructions. He will not be entitled to rely on corporate documents as authoritative sources governing which transactions an officer may and may not undertake, nor will he be allowed to trust a CEO's determinations as to which corporate engagements are valuable. And as a result, the dynamic that undergirds the attorney-client relationship will change fundamentally.

A simple, everyday hypothetical illustrates the danger. Suppose a corporate general counsel ("GC") tells a law firm partner to prepare a motion to compel in

anticipation of a discovery dispute. The GC instructs the partner to bill his time to "strategic research" because some of his subordinates are concerned about high discovery costs. The partner prepares the motion to compel and bills the client $25,000 for his services, but the parties end up reaching an agreement on the discovery dispute, and the motion to compel is never filed. Under the Third Court's reasoning, a jury can convict the GC and the law firm partner for felonies, on the ground that they misapplied corporate funds, all because twelve lay persons could decide, with hindsight, that drafting the motion added no value to the company.

This hypothetical situation is not hypothetical at all; it happens every day in law firms across Texas. GCs routinely provide attorneys with specific guidelines on how to bill certain tasks. And they routinely order their outside attorneys to prepare filings in advance, even though the filing may prove unnecessary. These unremarkable, long-standing practices have now been potentially criminalized.

The small financial figures at issue in this prosecution only underscore the danger in the decision below. The jury below decided that the sum of all improper payments was $212,000, spread over the course of 11 years, or an average of $19,273 per year, or just over $1,600 per month. In 2007, PEC's total operating expenses came to $403.1 million. Thus, an average year's alleged misapplication was *0.0048 percent* of a single year's operating budget. It is hard to imagine any

17

outside counsel second-guessing a CEO's business judgment as to such a *de minimis* sum. Yet according to the Third Court, Demond became a felon when he failed to do so.

*     *     *

Demond never anticipated that a jury would later determine that an external consultant was slightly overpaid, nor did he second-guess an executive's business judgment that keeping a qualified attorney on retainer was in the company's best business interests, nor did he anticipate that a jury, several years later, would declare the retainer relationship to be inadequately valuable. He simply followed instructions to bill these relatively minor expenses in the manner instructed by PEC's highest executive. Those activities do not warrant felony liability under §§ 7.02 and 32.45. The Third Court's decision to the contrary not only runs afoul of this Court's directives, but if left uncorrected, will fundamentally distort the attorney-client relationship in Texas.

## PRAYER FOR RELIEF

For the foregoing reasons, this Petition for Discretionary Review should be granted, and Petitioner's conviction for misapplication should be reversed with an order for a judgment of acquittal. Petitioner further requests any additional relief to which he may be entitled.

Because Petitioner's conviction for money laundering necessarily relied on the predicate crime of misapplication, it follows that Petitioner's conviction for money laundering lacked an essential element, and therefore his conviction for money laundering also should be reversed with an order for a judgment of acquittal.

If the Court should grant review of the Petition for Discretionary Review in No. PD-1537-14, *Fuelberg* v. *State*, the Court should grant this Petition as well, or, in the alternative, hold this Petition in abeyance pending the resolution of that case.

19

DATED:  January 21, 2015          Respectfully submitted,


                                   /s/ *James C. Ho*
                                  James C. Ho
                                  State Bar No. 24052766
                                  Kyle Hawkins
                                  *Motion for Admission Pro Hac Vice Pending*
                                  Prerak Shah
                                  State Bar No. 24075053
                                  GIBSON, DUNN & CRUTCHER LLP
                                  2100 McKinney Avenue, Suite 1100
                                  Dallas, TX  75201-6912
                                  Tel.:  (214) 698-3264
                                  Fax:  (214) 571-2917
                                  *jho@gibsondunn.com*

                                  COUNSEL FOR PETITIONER

## CERTIFICATE OF COMPLIANCE

I certify that the length of this Petition, excluding caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of questions presented, statement of procedural history, signature, proof of service, certificate of compliance, and appendix, is 4,494 words, as verified by the Microsoft Word 2010 "word count" feature.

/s/ *James C. Ho*
James C. Ho

**PROOF OF SERVICE**

I certify that a true and correct copy of the foregoing has been emailed to Dustin Howell, Assistant Solicitor General, on the day it was electronically filed with this Court, and that a copy was mailed to the State Prosecuting Attorney, P.O. Box 12405, Capitol Station, Austin, Texas, 78711, on the day it was electronically filed with the Court.

Dustin Howell
Assistant Solicitor General
Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas  78711-2548
dustin.howell@texasattorneygeneral.gov

Lisa C. McMinn
State Prosecuting Attorney
P.O. Box 12405, Capitol Station
Austin, Texas  78711

/s/ *James C. Ho*
James C. Ho

No. PD-1636-14

# In the Court of Criminal Appeals of Texas

**WALTER DEMOND**

**v.**

**THE STATE OF TEXAS**

**APPENDIX**

LIST OF DOCUMENTS

1.   COURT OF APPEALS' OPINION, DATED NOVEMBER 21, 2014 ……..……………….TAB A

2.   COURT OF APPEALS' ORDER, DATED JANUARY 7, 2014 ……………………………..TAB B

3.   COURT OF APPEALS' MEMORANDUM OPINION, DATED AUGUST 27, 2013 …………..TAB C

# TAB A

# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-11-00553-CR

Walter Demond, Appellant

v.

The State of Texas, Appellee

FROM THE DISTRICT COURT OF BLANCO COUNTY, 424TH JUDICIAL DISTRICT
NO. CR-1016, HONORABLE DANIEL H. MILLS, JUDGE PRESIDING

## O P I N I O N

A jury found appellant Walter Demond guilty of misapplication of fiduciary property, theft by deception, and money laundering. *See* Tex. Penal Code §§ 31.03, 32.45, 34.02. The jury assessed punishment at ten years' imprisonment for each offense, but recommended that the sentences be suspended and Demond be placed on community supervision. Demond raises eight issues on appeal. We affirm the trial court's judgments in part, reverse and vacate in part, and modify the conditions of Demond's community supervision.

## BACKGROUND

The Pedernales Electric Cooperative (PEC) is a member-owned utility that provides electrical service to twenty-four counties in Central Texas. *See* Tex. Util. Code §§ 161.001–.254 (describing formation and operation of utility cooperatives). Any resident in the PEC's service area

is required to join the PEC in order to receive electric service, and as of 2008 the PEC had over 225,000 members.

Demond was a partner at Clark, Thomas & Winters, PC (Clark Thomas), a law firm that had represented the PEC for several decades. Demond was the head of Clark Thomas's "energy group," which was the section of the firm that handled the PEC's representation. Demond's primary contact at the PEC was Bennie Fuelberg, who was the PEC's general manager from 1976 until 2008. Fuelberg was given broad authority to oversee the PEC's day-to-day operations, including expenditures on outside consultants.

**The parties' theories of the case**

The State alleges that between November 1996 and March 2007, Fuelberg conspired with Demond to funnel over $200,000 in PEC funds to Fuelberg's brother, Curtis, and William Price, the son of a former PEC board member.[1] According to the State, Fuelberg instructed Demond to hire Curtis as a consulting lobbyist for Clark Thomas and then have Clark Thomas bill the PEC $5,000 per month to pay the majority of Curtis's salary. Similarly, the State asserts that beginning in 2003, Fuelberg instructed Demond to have Clark Thomas pay Price a $2,000 monthly retainer and then bill the PEC for the cost of the retainer. All told, the State's forensic accountant testified that the PEC paid Clark Thomas $630,000 for Curtis's salary and $86,000 for Price's retainer.

The State contends that the PEC received no benefit from Curtis's and Price's employment. The State notes that Price did not know that his retainer was being paid by the PEC and that Price never performed any legal work for the PEC even though there was work available.

---

[1] We refer to Curtis Fuelberg by his first name to avoid confusion.

Similarly, the State emphasizes that Curtis did not register as a lobbyist for the PEC, and therefore he was prohibited from directly communicating with "the legislative or executive branch to influence legislation or administrative action on behalf of" the PEC. *See* Tex. Gov't Code §§ 305.003(b) (requiring lobbyists to register with Texas Ethics Commission), .031 (making violation of registration requirement a Class A misdemeanor). Thus, the State contends that Price and Curtis were "sham hires," meaning Fuelberg and Demond intentionally paid Price and Curtis with PEC funds, all the while knowing that the PEC would receive little or no benefit from Price's or Curtis's employment.

Furthermore, according to the State, Fuelberg and Demond went to great lengths to hide these payments from the PEC and Clark Thomas. Through a complex "billing scheme," Fuelberg allegedly instructed Demond to have Clark Thomas bill the PEC $30,000 every six months between 1996 and 2003, identify these payments as "legal services rendered in connection with regulatory and legislative services," then have Clark Thomas pay Curtis $6,000 per month—$5,000 of which came from the PEC.[2] Similarly, when Clark Thomas began paying Price's $2,000 monthly retainer, Demond personally added $7,000 per month to the PEC's bill to cover both the PEC's share of Curtis's salary and Price's retainer. This $7,000 "mark up" in the PEC's bill did not include an explanation of what these payments were for, which the State asserts made it impossible for the PEC to determine how its money was being spent. When the PEC's "legal services manager" contacted Demond to get an explanation for these $7,000 payments, Fuelberg instructed Demond to ignore that request and direct all of Clark Thomas's bills to Fuelberg for approval. Similarly, when another

---

[2] Demond would later testify that Fuelberg suggested that Clark Thomas should also contribute to Curtis's salary but that the PEC's "share" of Curtis's salary was always $5,000 per month.

partner at Clark Thomas asked Demond if the PEC was paying for Curtis's salary, Demond initially said no, but then said that the PEC's board of directors knew about and had approved the $7,000 monthly payments to Curtis and Price.

Fuelberg retired from the PEC in February 2008. One month later, the PEC's new general manager hired Navigant Consulting to investigate and prepare a report about the PEC's outside consulting expenditures during Fuelberg's tenure. Part of Navigant's investigation included PEC's payments to Clark Thomas. On December 15, 2008, Navigant issued its report (the Navigant Report), detailing Fuelberg and Demond's alleged scheme to transfer PEC funds to Curtis and Price through Clark Thomas.

At trial, and again on appeal, Demond asserts that Fuelberg had the authority to hire any outside consultant he deemed appropriate, and therefore there was nothing unlawful about Fuelberg's hiring Curtis and Price through Clark Thomas. Demond, in fact, testified that Fuelberg informed him that the PEC board was aware of and approved this arrangement. Demond contends that Curtis provided valuable lobbying services for the PEC and that having Price on retainer was inherently valuable for both the PEC and Clark Thomas. According to Demond, both he and Fuelberg believed that Curtis and Price were worth what the PEC paid them, and therefore Demond should not be subject to criminal liability merely because the State or the jury, in hindsight, disagreed with their valuation of Curtis's and Price's services.

**Procedural history**

Seven months after the Navigant Report was issued, Fuelberg and Demond were each indicted for first-degree felony misapplication of fiduciary property, first-degree felony theft

4

by deception, and second-degree felony money laundering. *See* Tex. Penal Code §§ 31.03(e)(7) (making theft a first-degree felony if value of property stolen was more than $200,000), 32.45(c)(7) (same punishment range for misapplication of fiduciary property), 34.02(e)(3) (making money laundering a second-degree felony if value of fund is more than $100,000 but less than $200,000). Prior to trial, Fuelberg and Demond filed motions to disqualify or, alternatively, recuse the Honorable Daniel H. Mills from their respective cases. The motions asserted that as a PEC member, Judge Mills had a personal and pecuniary interest in this case and that a reasonable person might question Judge Mills's impartiality. Judge Mills declined to voluntarily recuse himself and referred the motions to the presiding judge, who assigned the motions to the Honorable Bert Richardson. *See* Tex. R. Civ. P. 18a (prescribing procedure for resolving motions to disqualify and recuse). Judge Richardson conducted a hearing, after which he denied Fuelberg's and Demond's motions.

Fuelberg and Demond were tried separately, with Demond's trial taking place three months after Fuelberg's. In Demond's trial, the State called a total of eighteen witnesses. Demond called a total of twenty-one witnesses, many of whom testified about the value of Curtis's lobbying work, including work on behalf of the PEC. Finally, Demond testified in his own defense, asserting that he believed Fuelberg had the authority to hire outside consultants of his choosing, that Fuelberg told him the PEC board was aware of these hires, and that Curtis and Price provided real value to the PEC.

The jury found Demond guilty of the lesser-included offense of second-degree felony misapplication of fiduciary property, first-degree felony theft by deception as alleged, and second-degree felony money laundering as alleged. The jury assessed punishment at ten years' imprisonment

5

for each offense, but recommended that the sentences be suspended and that Demond be placed on community supervision. The trial court rendered judgment consistent with the jury's verdict and ordered Demond to serve a total of 500 days in jail as a condition of his community supervision. This appeal followed.

## DISCUSSION

Demond raises eight issues on appeal, which we group into the following six complaints. First, Demond asserts that the evidence is insufficient to support his convictions. Second, he claims that there is a material variance between the indictment and the evidence adduced at trial. Third, he contends that the trial court could not require him to spend more than 180 days in jail as a condition of his community supervision. Fourth, Demond argues that his convictions for misapplication of fiduciary property and theft violate the prohibition against double jeopardy. Fifth, Demond asserts that Judge Mills should have been disqualified or recused from presiding over his case. Finally, Demond asserts that the trial court erred in dismissing a juror as disqualified based on the juror's temporary medical condition. We address Demond's material-variance argument first.

**Variance between indictment and evidence at trial**

In his third appellate issue, Demond asserts that there is a material variance between the indictment and the evidence produced at trial. Specifically, Demond argues that the indictment cannot support the State's theory that he was a party to Fuelberg's misapplication of fiduciary property. *See* Tex. Penal Code § 32.45. Under the law of parties, the defendant is culpable only if the State proves that (1) a principal actor committed the charged offense and (2) the defendant

6

encouraged, directed, aided, or attempted to aid that offense. *See id.* §§ 7.01–.02(a)(2). According to Demond, however, the indictment alleges that he misapplied property which *he* held as a fiduciary, and thus it was a material variance for the State to prove that he helped Fuelberg misapply property that *Fuelberg* held as a fiduciary.

"A 'variance' occurs whenever there is a discrepancy between the allegations in the indictment and the proof offered at trial." *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011) (citing *Gollihar v. State*, 46 S.W.3d 243, 246 (Tex. Crim. App. 2001)). However, a variance is material—and thus reversible error—only if it "fails to give the defendant sufficient notice [of the offense alleged] or would not bar a second prosecution for the same" crime. *See id.* at 247–48. It is well established that the indictment need not "include notice that the State will attempt to prove its case under the law of parties." *Marable v. State*, 85 S.W.3d 287, 292 (Tex. Crim. App. 2002) (Cochran, J., concurring) (internal citations omitted); *see also Powell v. State*, 194 S.W.3d 503, 506 (Tex. Crim. App. 2006) (unanimous opinion citing *Marable*, 85 S.W.3d at 288, for same proposition). Therefore, an accused may be convicted as a party to the offense even if the indictment does not explicitly charge him as a party. *See Boston v. State*, 373 S.W.3d 832, 837 (Tex. App.—Austin 2012), *aff'd*, 410 S.W.3d 321, 327 (Tex. Crim. App. 2013).

In this case, the indictment alleges, in relevant part, that:

> [Demond] intentionally or knowingly misapplied property, that being: money of the [PEC], contrary to an agreement under which the Defendant held the property as a fiduciary and in a manner that involved substantial risk of loss to PEC, the owner of the property and the person for whose benefit the property was held, by making or causing payments to be made to Curtis Fuelberg, who is Bennie Fuelberg's brother, and to William Price, and the aggregate value of the property misapplied was more than $200,000.

7

Demond asserts that because the indictment alleges that he misapplied property that he held as the PEC's fiduciary, the State could not assert at trial that he was a party to misapplication of property that Fuelberg held as a fiduciary. *See* Tex. Penal Code §§ 7.01–.02(a)(2) (defining criminal liability for parties to an offense). This Court recently rejected a nearly identical argument in *Rainey v. State*, No. 03-11-00741-CR, 2013 WL 692477, at *3–5 (Tex. App.—Austin Feb. 22, 2013, pet. ref'd) (mem. op., not designated for publication).

In *Rainey*, a defendant convicted of aggravated sexual assault asserted that "because the indictment allege[d] that *his* sexual organ penetrated [the victim's] mouth, it was a material variance for the State to prove that [the victim's] mouth was actually penetrated by the sexual organ of" another. *Id.* at *4. We disagreed, explaining that "there is no reason why the indictment needs to provide notice that the law of parties as applied to the charged offense necessarily involved the use of another assailant's sexual organ." *Id.* at *5. Given that "there is nothing in the language of the penal code to indicate that 'party liability is inappropriate' with respect to aggravated sexual assault," we concluded that the defendant's material-variance argument was inconsistent with both the sexual-assault statute and the law of parties. *Id.* (quoting *McIntosh v. State*, 52 S.W.3d 196, 200 (Tex. Crim. App. 2001)).

Similarly here, for a defendant to be guilty as a party to misapplication of fiduciary property, another principal actor—in this case Fuelberg—would have to hold the property as a fiduciary, and the defendant would have to encourage, direct, aid, or attempt to aid the principal's misapplication of that property. Given that there is nothing in the language of the Penal Code to indicate that party liability is inappropriate with respect to misapplication of fiduciary property, the

indictment did not need to specifically inform Demond that, under the law of parties, he would be liable for helping Fuelberg misapply property that Fuelberg held as a fiduciary. Therefore, we conclude that there is not a material variance between the indictment in this case and the evidence adduced at trial. We overrule Demond's third appellate issue.

**Sufficiency of the evidence**

In his first, second, and fifth issues on appeal, Demond argues that the evidence is insufficient to support his convictions in three respects. First, Demond claims that the evidence established that Fuelberg had the authority to hire any outside consultant he deemed appropriate without the need to seek the PEC board's approval. Second, Demond asserts that if the PEC received any benefit from Curtis's or Price's services, then the PEC's money was not stolen or misapplied as a matter of law. Third, Demond contends that he cannot be convicted of money laundering because the PEC's money did not become the "proceeds of criminal activity" until Curtis and Price received payment from Clark Thomas, which was the last transaction in this offense, and thus Demond never transferred the proceeds of criminal activity. We will briefly discuss the applicable standard of review and elements of each offense before addressing Demond's arguments.

*Standard of review and elements of each offense*

In reviewing the sufficiency of the evidence to support a conviction, we determine whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). In making this determination, we consider all evidence that the trier of fact was permitted to

9

consider, regardless of whether it was rightly or wrongly admitted. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Allen v. State*, 249 S.W.3d 680, 688-89 (Tex. App.—Austin 2008, no pet.). We view this evidence in the light most favorable to the verdict. *Clayton*, 235 S.W.3d at 778. The jury, as the trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Id.* Therefore, we presume that the jury resolved any conflicting inferences and issues of credibility in favor of the judgment. *Id.*

To prove misapplication of fiduciary property, the State was required to show beyond a reasonable doubt that Demond intentionally or knowingly[3] (1) misapplied property (2) that he held as a fiduciary (3) in a manner that involved a substantial risk of loss to the owner of the property or to the person for whose benefit the property was held. *See* Tex. Penal Code § 32.45(b); *Bowen v. State*, 374 S.W.3d 427, 431 (Tex. Crim. App. 2012). "'Misapply' means deal with property contrary to: (A) an agreement under which the fiduciary holds the property; or (B) a law prescribing the custody or disposition of the property." Tex. Penal Code § 32.45(a)(2). A "substantial risk of loss" has been interpreted to mean that it must be "more likely than not" that the property would be lost. *Casillas v. State*, 733 S.W.2d 158, 164 (Tex. Crim. App. 1986).

To establish theft, the State was required to prove that Demond (1) unlawfully appropriated the PEC's property (2) with the intent to deprive the PEC of its property. *See* Tex.

---

[3] Generally, a defendant can be liable for intentionally, knowingly, or recklessly misapplying fiduciary property. *See* Tex. Penal Code § 32.45. However, the indictment in this case alleged only that Demond intentionally or knowingly misapplied the PEC's property and, therefore, he could not be convicted for the less culpable mental state of recklessness. *See Reed v. State*, 117 S.W.3d 260, 264–65 (Tex. Crim. App. 2003) (concluding trial court erred in instructing jury on less culpable mental state of recklessness that was not alleged in indictment).

10

Penal Code § 31.03(a). In this case, the appropriation was allegedly unlawful because "it [was] without the owner's effective consent." *See id.* § 31.03(a). Specifically, the indictment alleges that the PEC's consent was ineffective because it was induced by deception. *See id.* § 31.01(3)(A); *see also Geick v. State*, 349 S.W.3d 542, 547–48 (Tex. Crim. App. 2011) (concluding that when indictment alleges theft by deception, State is limited to that theory of effective consent). Thus, the State was required to show that the PEC "actually relied upon the defendant's deceptive acts" when giving its consent. *Daugherty v. State*, 387 S.W.3d 654, 659 n.18 (Tex. Crim. App. 2013). A defendant intentionally "deprives" an owner of his property if the defendant "dispose[s] of property in a manner that makes recovery of the property by the owner unlikely." *See* Tex. Penal Code § 31.01(2)(C).

Finally, to convict Demond of money laundering, the State was required to prove that he knowingly (1) acquired, maintained an interest in, concealed, possessed, or transferred (2) the proceeds of a criminal activity—to wit, theft of money or misapplication of fiduciary property valued at more than $100,00 but less than $200,000. *See id.* § 34.02(a)(1)–(2). "'Proceeds' means funds acquired or derived directly or indirectly from, produced through, realized through, or used in the commission of an act." *Id.* § 34.01(4)(A). "Criminal activity" is defined as "any offense, including any preparatory offense, that is classified as a felony under the laws of this state or the United States." *Id.* § 34.01(1)(A).

At trial, the State primarily asserted that Demond was liable as a party to Fuelberg's criminal conduct. For a defendant to be guilty as a party to an offense, another principal actor—in this case Fuelberg—would have to commit the underlying offense, and the defendant would have

11

to intentionally encourage, direct, aid, or attempt to aid the principal's commission of that offense. *See id.* § 7.02. Therefore, with respect to this party theory of liability, the State was required to prove (1) that Fuelberg committed the above offenses; (2) that Demond acted with the intent to promote or assist the commission of those offenses; and (3) that Demond encouraged, directed, aided, or attempted to aid Fuelberg's commission of those offenses. *See id.* §§ 7.01–.02(a)(2).

Our analysis will focus on whether the evidence is sufficient to prove that Demond is liable as a party to Fuelberg's misapplication of fiduciary property. However, we will primarily consider whether Demond is guilty of theft by deception based on his own conduct. Circumstantial evidence may be used to prove the defendant is a party to an offense, and a factfinder may look to events occurring before, during, and after the commission of the offense that show an understanding or common design to do the prohibited act. *See Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012).

*Fuelberg's authority to hire outside consultants*

In his first issue on appeal, Demond asserts that Fuelberg had the "actual authority" to hire Curtis and Price without notifying or seeking the approval of the PEC's board. According to Demond, "[t]here is no such thing as theft or misapplication by spending a company's money with the company's permission" and, therefore, Fuelberg could not be guilty of stealing or misapplying the PEC's money because he had the authority to hire outside consultants as he saw fit. Given that Fuelberg was not guilty of the charged offenses, Demond asserts that he could not be guilty as a party to Fuelberg's conduct. *See Barnes v. State*, 62 S.W.3d 288, 298 (Tex. App.—Austin 2001, pet.

12

ref'd) ("If the State is to prove the accused's guilt as a party, it must first prove the guilt of another as the primary actor.").

Although not framed in these terms, we understand Demond's argument to be that the evidence is insufficient to prove that Fuelberg lacked the authority to hire Curtis and Price. With respect to theft by deception, Fuelberg's actual authority to hire outside consultants is not dispositive because if Fuelberg obtained or retained his authority through deception, then the PEC's grant of authority to Fuelberg would be ineffective. *See, e.g.*, *Bender v. State*, No. 03-09-00652-CR, 2011 WL 1561994, *9–10 (Tex. App.—Austin Apr. 19, 2011, pet. ref'd) (mem. op., not designated for publication) (concluding evidence sufficient to show manager obtained investment capital through deception by promising he would not draw salary until company was profitable). With respect to the misapplication-of-fiduciary-property charge, however, Demond's argument would mean that because Fuelberg had the actual authority to hire Curtis and Price, the evidence is insufficient to establish that Fuelberg dealt with the PEC's property contrary to the fiduciary agreement under which it was held. *See* Tex. Penal Code § 32.45(a)(2)(A).

The undisputed evidence admitted at trial established that Fuelberg had broad authority to hire both PEC employees and outside consultants. As one former PEC director stated, Fuelberg "had the authority to hire and fire whomever he wanted as long as it wasn't prohibited by the [PEC's] bylaws." The primary bylaw that was discussed at trial was the PEC's "Nepotism Policy," which stated that "the employment of close relatives shall be discouraged" and that "[c]ompensation, if any, of any officer or an employee who is also a director or close relative of a director shall be fixed by the board of directors." However, it is undisputed that Curtis and Price

13

were outside consultants rather than PEC employees, and as such their salaries were not covered by the Nepotism Policy. There is no evidence to indicate that any other PEC bylaw limited Fuelberg's authority to hire outside consultants. Thus, although the PEC generally discouraged hiring close relatives, the evidence established that Fuelberg was not required to inform the PEC board or seek its approval before hiring outside consultants—including Curtis and Price.

Nevertheless, there was evidence adduced at trial which demonstrated that Fuelberg did not have the authority to spend PEC funds in a way that he knew would not benefit the PEC. Fuelberg's employment contract states that he was required to "perform all of his duties properly and faithfully in the best interest of the PEC." Similarly, the PEC's "Causes for Disciplinary Action"—applicable to all PEC employees since 1979—states that "[d]ishonesty, willful damage and/or unauthorized appropriation of Cooperative funds or property" are grounds for immediately terminating employment. This is consistent with the testimony of two former PEC board members and Demond's law partner at Clark Thomas, all of whom stated that Fuelberg's broad authority to conduct the PEC's day-to-day operations did not include the authority to misappropriate PEC funds as additional income for himself or as gifts to his family and friends. *See Bender*, 2011 WL 1561994 at *9 (noting that written partnership agreement provided that manager could only use company funds for "legitimate business purposes").

Therefore, if the jury determined that Fuelberg knew that the PEC would receive little or no benefit from Curtis's and Price's employment, then the jury could have found beyond a reasonable doubt that Fuelberg did not have the authority to make these payments to Curtis and Price. Thus, if Fuelberg knew that the PEC would receive little or no benefit from these hires, then

14

there is sufficient evidence to prove that Fuelberg's transfer of PEC funds to Curtis and Price was contrary to the agreement under which Fuelberg held the PEC's property. *See* Tex. Penal Code § 32.45(a)(2)(A). We overrule Demond's first appellate issue. Next, we will consider whether the evidence is sufficient to support the jury's determination that Fuelberg knew that the PEC would receive little or no benefit from Curtis's and Price's employment.

*Does a finding of any value require acquittal*?

In his second issue on appeal, Demond asserts that if the PEC received any value from Curtis's work as a lobbyist or Price's retainer, then the misapplication-of-fiduciary-property and theft charges fail as a matter of law. Specifically, Demond claims that he should not be held criminally liable merely because the jury second-guessed his and Fuelberg's determination of what Curtis's and Price's professional services were worth. According to Demond, this type of "ex post facto" valuation by the jury is inconsistent with the traditional deference the law affords to an executive's business judgment and would leave executives uncertain of when their business decisions could result in criminal liability.

Again, although not framed in these terms, Demond essentially argues that if the jury found that the PEC received any value from Curtis and Price, there cannot be sufficient evidence to support Demond's misapplication-of-fiduciary-property and theft convictions. Demond's argument can best be understood to mean that if Curtis and Price provided any value to the PEC, then Fuelberg and Demond must have believed that their estimation of Curtis's and Price's value was correct, and therefore Curtis and Price were not sham hires. Thus, according to Demond, unless

15

the jury found that Curtis and Price produced no value for the PEC, there is no basis for the jury to infer that Fuelberg or Demond intentionally or knowingly misapplied or stole the PEC's money.

This argument relates to the sufficiency of the evidence to support three essential elements of theft and misapplication of fiduciary property: (1) Fuelberg's and Demond's culpable mental states, (2) Fuelberg's authority to hire Curtis and Price, and (3) the harm that resulted.[4] Regardless of which element Demond's argument is applied to, however, the ultimate issue is the same—if Curtis and Price provided some value to the PEC, could the jury nevertheless infer that Fuelberg and Demond intentionally stole all or part of Curtis's salary and Price's retainer? Because we conclude that the answer is yes, we find that the evidence is sufficient to support the jury's verdict.

The problem with Demond's argument becomes apparent when we consider a slightly different set of facts. Assume that instead of lobbying, Curtis sold office supplies. If Fuelberg bought a $4,000 copy machine from Curtis for the PEC but then paid Curtis $5,000 for that copier, it would be obvious that Fuelberg misapplied and stole $1,000 from the PEC. Furthermore, if Fuelberg instructed Demond to have Clark Thomas purchase that same copier for the same $5,000,

---

[4] With respect to the culpable mental state, if Fuelberg or Demond believed that Curtis and Price were worth what the PEC paid them, then Fuelberg and Demond did not (1) intentionally or knowingly misapply the PEC's property or (2) intentionally deprive the PEC of its property. *See* Tex. Penal Code §§ 31.03(a), 32.45(b). Similarly, as discussed above, if Fuelberg believed that Curtis and Price were worth what he was paying them, then Fuelberg was acting within his authority to hire the outside consultants that he deemed appropriate and, therefore, he did not deal with the PEC's property contrary to an agreement under which it was held. *See id.* § 32.45(a)(2)(A). Finally, with respect to harm, if Fuelberg or Demond had a good-faith belief that Curtis and Price were worth what the PEC paid them, then arguably (1) there was not a substantial risk of loss of the PEC's money and (2) neither Fuelberg nor Demond disposed of the PEC's money in a manner that made recovery of the money unlikely. *See id.* §§ 31.01(2)(C), 32.45(b).

16

then have Clark Thomas bill the PEC for the expense, Demond could be culpable as a party to Fuelberg's theft and misapplication of PEC funds if Demond knew that the PEC was overpaying for the copier. Thus, the fact that PEC may have received some benefit from Fuelberg's purchase—and therefore the amount that Fuelberg paid Curtis was not entirely stolen—does not mean that Fuelberg and Demond cannot be criminally liable for the amount that they intentionally overpaid.

Admittedly, the value of professional services may be more open to interpretation than the value of tangible goods whose fair-market price is often readily identifiable. Arguably, this is even more true for lobbying services or legal work because an individual lobbyist or lawyer may be particularly valuable depending on his or her abilities, experience, and relationships with relevant legislators or judges, factors that may be difficult for a jury to evaluate. Thus, it is not enough that the jury simply believed that, in hindsight, Demond and Fuelberg overestimated Curtis's and Price's value. Rather, there must be sufficient evidence from which the jury could infer that Demond and Fuelberg intended to overpay Curtis and Price throughout the course of their alleged scheme. With this framework in mind, we consider whether the record supports the jury's determination that Fuelberg and Demond intended to overpay Curtis and Price.

*Price's retainer*

There is ample evidence from which the jury could infer that Fuelberg and Demond never intended for the PEC to receive any benefit for Price's $2,000 monthly retainer. Admittedly, there was testimony that having a lawyer on retainer has value regardless of whether the lawyer ultimately performs any work. However, Price testified that he never knew that PEC was paying his retainer, was never advised that he might be doing work for the PEC, and was never given any work

17

for the PEC. Furthermore, Demond admitted on cross-examination that during the years that Price was on retainer, Clark Thomas performed work for the PEC that Price was qualified to handle and the work would have cost less than $2,000, meaning that Price could have performed the work at no additional cost to the PEC. When pressed for an explanation as to why Price was not used on these projects, Demond simply stated "I wish I had thought of that."

Based on Price's testimony that he was never informed that the PEC was paying his retainer and Demond's inability to explain why Price was not given PEC work when it was available, the jury could have reasonably inferred that Fuelberg and Demond never intended for the PEC to receive any benefit from having Price on retainer. Thus, there is sufficient evidence to support the jury's conclusion that Fuelberg misapplied the entire $86,000 in PEC funds that was used to pay Price's retainer. In reaching this conclusion, we in no way seek to impugn Price's abilities or value as an attorney; we are merely explaining that the jury could have reasonably concluded that Demond and Fuelberg never intended to utilize Price's legal services for the benefit of the PEC.

*Curtis's salary*

There is, admittedly, more conflicting evidence concerning Curtis's value as a lobbyist for the PEC. Mike Williams is the president and chief executive officer of Texas Electric Cooperatives (the "Coop Association"), a trade association providing "legislative political advocacy services" on behalf of electric cooperatives in Texas, including the PEC. Williams testified that during the 1997 and 1999 legislative sessions, the Texas Legislature was in the process of deregulating electric utilities, which could have significantly impacted all utility cooperatives. *See generally Cities of Corpus Christi v. Public Util. Comm'n*, 188 S.W.3d 681, 687 (Tex. App.—Austin 2005,

18

pet. denied) (discussing legislative history and purpose of utility deregulation). According to Williams, Fuelberg contacted him in 1996 and suggested that Williams hire Curtis to help the Coop Association's lobbying team in exchange for the PEC contributing $70,000 to the association. Williams agreed and contracted to pay Curtis $4,000 per month. However, Williams stated that some of the association's members "were uncomfortable with the fact that we had hired the brother of one of the managers of one of our systems," especially after the members learned how much the PEC had contributed to the association's lobbying efforts. Although the Coop Association intended to honor its contract with Curtis, Curtis voluntarily terminated his relationship with the association at the end of October 1996, approximately five months after he was originally retained.

Demond testified that Fuelberg approached him in October 1996—the same month that Curtis stopped working for the Coop Association—and suggested that Demond call Curtis to get his opinion about how deregulation might affect the PEC. Demond recalled that he was impressed with Curtis's knowledge and suggested that the PEC or Clark Thomas pay Curtis for his advice. According to Demond, Fuelberg agreed and suggested that Clark Thomas hire Curtis as a consulting lobbyist, with the PEC contributing $5,000 per month for Curtis's salary and Clark Thomas contributing an additional $1,000 or $2,000. Demond hired Curtis, telling him to "keep Pedernales Electric happy."

Curtis testified that he was a "legislative consultant," rather than a lobbyist, for the PEC. As Curtis explained, a legislative consultant keeps a client "informed of what's going on legislatively" but does not directly lobby legislators to "affect the outcome of legislation." Curtis admitted that he did not register as a lobbyist for the PEC and, therefore, was legally prohibited from

19

contacting legislators or agency officials on behalf of the PEC. *See* Tex. Gov't Code § 305.003(b) (requiring lobbyists to register with Texas Ethics Commission). Furthermore, Curtis conceded that apart from Clark Thomas, no client had ever paid him more than $4,000 per month and that when he was receiving $4,000 per month, it was from large organizations like the Coop Association or American Electric Power during significant legislative sessions.[5]

Several witnesses, including four current and former members of the Texas legislature, testified that Curtis was a well-respected and effective lobbyist. Some members of the legislature knew, or at least assumed, that Curtis was representing the PEC during legislative sessions despite the fact that Curtis was not registered as a lobbyist for the PEC. However, Williams testified that Curtis did not participate in the utility cooperatives' negotiations concerning deregulation in the 1997 and 1999 legislative sessions. Furthermore, Curtis's salary from the PEC—paid indirectly through Clark Thomas—did not change between 1996 and 2007, despite the fact that the PEC employed other lobbyists during this time and that there were no other potential legislative matters that would have impacted the PEC as much as deregulation. The jury could have reasonably inferred from this that Fuelberg intended to pay Curtis the same salary regardless of the amount of work he was performing for the PEC at any given time.

Arguably the most damning evidence was the considerable testimony and documentation concerning the lengths to which Demond and Fuelberg went in order to conceal

---

[5] Williams testified that the Coop Association "staffed up" by adding Curtis in 1996 because deregulation could mean that all utility cooperatives would no longer be regulated by the Public Utility Commission. Similarly, Curtis explained that American Electric Power paid him $4,000 per month for two years to make sure the legislature did not facilitate a merger between two of his employer's main Texas competitors, both of which American Electric Power purchased in that time frame.

20

Curtis's employment from the PEC. *See King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (noting that defendant's false statements to conceal crime evidences consciousness of guilt); *Alvarez v. State*, No. 03-02-00262-CR, 2003 WL 22095777, at *8 (Tex. App.—Austin Sept. 11, 2003, no pet.) (mem. op., not designated for publication) (discussing how "insistence on secrecy" after commission of crime is strong indication of intent). On cross-examination, Demond admitted that he initially included a "line item for Curtis Fuelberg" in Clark Thomas's bill to the PEC, but Fuelberg called Demond and told him that "he didn't want his brother's name on the bill" because "he didn't want every clerk in the [PEC's] accounting department to know." Demond suggested that they identify Curtis's salary as "legislative consultant," but Fuelberg said that was also unacceptable. Finally, Demond and Fuelberg agreed to label Curtis's payment as "for legal services rendered in connection with regulatory and legislative matters"—despite the fact that Curtis was not a lawyer or other legal professional and therefore could not provide legal services.

Furthermore, there was evidence that Demond evaded the PEC's inquiries into the monthly $7,000 fees that were being used to pay Curtis's salary and Price's retainer. Demond testified that when Luis Garcia, the PEC's legal services manager who was in charge of reviewing the PEC's outside legal fees, called Demond about these fees, Demond called Fuelberg to ask whether he should respond. Fuelberg instructed Demond to ignore Garcia's inquiry and to send all of Clark Thomas's bills directly to Fuelberg for approval. Garcia testified that this form of "block billing" made it impossible for the PEC to determine what it was being charged for.

Demond testified that he and Fuelberg concealed Curtis's employment from the PEC because Fuelberg was concerned that if other PEC employees knew about this arrangement, they

21

might try to secure similar PEC consulting positions for their relatives. Assuming that this was a plausible explanation for not listing Curtis's name in Clark Thomas's bills, the jury could have reasonably determined that it did not explain why Curtis's lobbying work was listed as "legal services in connection with regulatory and legislative matters"—a heading which mischaracterizes the nature of the work being performed. Thus, the record reflects that Demond and Fuelberg concealed not only who was working for PEC, but also the nature of the work being performed, and therefore the jury could have reasonably discredited Demond's explanation of why he and Fuelberg concealed Curtis's employment from the PEC.

Additionally, there was evidence that Demond arguably misled other partners at Clark Thomas about the fact that the PEC was paying most of Curtis's salary and all of Price's retainer. David Duggins, a partner at Clark Thomas during the years relevant to this case, testified that Demond approached him in November of 2007 to ask if Clark Thomas should allow Curtis's and Price's contracts to expire. Duggins asked Demond if the PEC was paying for these contracts, and Duggins testified that Demond "told me no." Shortly after that conversation, Duggins heard "something about the PEC's share" of Curtis's and Price's contract. Duggins again asked Demond whether the PEC was paying for these contracts, and it was only after being asked a second time that Demond explained that Fuelberg instructed him to pay Curtis and Price in this manner and then bill the PEC for their services.

Duggins conceded that when he initially asked Demond about Curtis's and Price's contracts, the PEC actually had stopped contributing payments for those contracts, and thus Demond's original answer that the PEC was not paying for Curtis and Price was technically true at

22

that time.[6] Nevertheless, Duggins stated that he "would have preferred to know the whole story" when he asked. The jury could have inferred that Demond's original statement to Duggins denying that the PEC was paying for Curtis's and Price's contracts, although technically true, was intended to mislead Duggins about Demond's arrangement with Fuelberg. *See Bell v. State*, 26 S.W.3d 516, 521–22 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (noting that literally true statements can be deliberately misleading and thus support perjury conviction).

The Court does not lack sympathy for Demond's concern that a jury should not be allowed to determine the value of a business decision made by a company's executive. Whether a given business decision is motivated by an intent to deprive a company of its property is an inherently difficult issue to determine and will inevitably turn on the particular facts of a given case. However, juries are required to make such value judgments under the Penal Code, and it is not the Court's place to second-guess the jury so long as its decision is supported by evidence in the record.

In this case, the jury heard testimony that:

- Demond and Fuelberg intentionally concealed Curtis's payments from the PEC's accounting department and Garcia;

- Demond misled Duggins about the fact that the PEC had been paying for Clark Thomas's contracts with Curtis and Price;

- Curtis was hired by Clark Thomas the same month that he stopped working for the Coop Association, at least in part, because the association's members had concerns about employing the PEC general manager's brother given that the PEC contributed a large sum to the Coop Association's lobbying efforts;

- Curtis was not registered as a lobbyist for the PEC, and therefore could only "keep his ear to the ground" rather than directly lobby the legislature;

---

[6] The PEC's contribution for Curtis's salary and Price's retainer ended in March of 2007.

23

- Even as a registered lobbyist, Curtis had never been paid more than $4,000 per month by any other employer, despite the fact that he worked for other large companies on significant legislative issues;

- Curtis's salary remained unchanged regardless of whether there was major legislation affecting the PEC; and

- Demond and Fuelberg used the same payment scheme to bill Curtis's salary as they did to conceal Price's retainer, and thus the jury could infer that Curtis's salary was similarly a sham. *See* Tex. Penal Code § 31.03(c)(1) (providing that evidence indicating defendant participated in "recent transactions other than, but similar to, that which the prosecution is based is admissible for the purpose of showing knowledge or intent.").

Based on this record, the jury could have reasonably concluded beyond a reasonable doubt that Fuelberg intentionally and knowingly overpaid Curtis for his services. Furthermore, the jury could have reasonably determined that, at a minimum, this intentional overpayment resulted in misapplication of $1,000 per month in PEC funds for 126 months because Curtis's services to the PEC could not have been worth more than $4,000 per month. Thus, the jury could have reasonably concluded that Fuelberg intentionally misapplied $126,000 of the PEC's money to overpay Curtis. *See id.* § 31.09 (noting that amounts of individual theft may be aggregated as one offense if part of "one scheme or continuing course of conduct"). Having already concluded that there is sufficient evidence to find that the entire $86,000 used to pay Price's retainer was misapplied, we conclude that there is sufficient evidence to support the jury's finding that Fuelberg misapplied PEC property valued at more than $100,000 but less than $200,000.[7]

---

[7] The jury convicted Demond of second-degree felony misapplication of fiduciary property, indicating that the value of the property misapplied was between $100,000 and $200,000, but convicted him of first-degree felony theft, indicating that the value of the money stolen was more than $200,000. This apparent inconsistency does not affect our sufficiency analysis, however, because "[i]nconsistent verdicts do not necessarily imply that the jury convicted the defendant on insufficient

24

Similarly, the jury heard considerable evidence about the lengths that Demond went to in order to assist Fuelberg in concealing Curtis's salary and Price's retainer. Demond himself admitted that he mischaracterized Curtis's lobbying work as legal services. Additionally, when Garcia—who was responsible for overseeing the PEC's expenditures on outside legal work—asked Demond to explain Clark Thomas's bill, Demond immediately asked Fuelberg if he had to respond and then accepted Fuelberg's instruction to ignore Garcia's inquiry and direct all bills directly to Fuelberg for approval. Based on this evidence, the jury could have reasonably concluded that Demond intentionally assisted Fuelberg's misapplication of PEC funds, and therefore Demond was liable as a party to that offense. *See id.* § 7.01(a).

*Consent induced by deception*

Because the State alleged that Demond committed theft *by deception*, the relevant unlawful conduct for theft is slightly different from that which would support misapplication of fiduciary property. *See Geick*, 349 S.W.3d at 547–48 (concluding that if indictment alleges theft by deception, State is limited to that theory of theft). To constitute theft by deception, the victim's consent to the defendant's control over the property is ineffective because the consent was "induced by deception," meaning that the victim relied on the defendant's deceptive act when giving his consent. Tex. Penal Code § 31.01(3)(A); *see also Daugherty*, 387 S.W.3d at 659 n.18 (citing *Swope*

evidence, but may simply stem from the jury's desire to be lenient or to execute its own brand of executive clemency." *Thomas v. State*, 352 S.W.3d 95, 101 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd); *see also Williams v. State*, No. 03-11-00598-CR, 2013 WL 6921489, at *6 (Tex. App.—Austin Dec. 31, 2013, pet. ref'd) (mem. op., not designated for publication) (citing several cases for same proposition), *cert. denied*, 135 S.Ct. 103 (2014).

*v. State*, 723 S.W.2d 216, 223 (Tex. App.—Austin 1986), *aff'd on other grounds*, 805 S.W.2d 442 (Tex. Crim. App. 1991)). "The reliance need not be the sole, or even controlling, reason why the victim decided to provide [his consent], but it must be a substantial or material factor in the decision-making process." *Daugherty*, 387 S.W.3d at 659 n.18 (internal citations omitted).

Deception is defined as, among other things, "(1) creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true or (2) preventing another from acquiring information likely to affect his judgment in the transaction." Tex. Penal Code § 31.01(1)(A), (C). It is clear from the record discussed above that there is sufficient evidence that both Fuelberg and Demond deceived the PEC. According to Demond's own testimony, Fuelberg instructed him to change Clark Thomas's bills to the PEC so that those reviewing the PEC's expenses could not determine that it was indirectly paying Curtis and Price. Therefore, the relevant issue is whether there is sufficient evidence to establish that the PEC relied on Fuelberg's or Demond's deception before giving its consent.

It is somewhat difficult to envision how these deceptive acts induced the PEC to give Fuelberg broad authority to hire outside consultants. A PEC director testified that Fuelberg was given this broad authority decades before any of the alleged wrongdoing in this case. Furthermore, there is no allegation that Fuelberg secured this initial grant of authority through any express or implied promise, factual assertion, or other misrepresentation that is relevant here.[8] *See Daugherty*,

---

[8] Even if the PEC's original grant of authority was based on Fuelberg's assurance that he would only use PEC resources for the PEC's benefit, there was no evidence that Fuelberg did not intend to honor that assurance at the time.

26

387 S.W.3d at 658 (noting that deception must occur before victim provided services to prove theft of services by deception); *Swope*, 723 S.W.2d at 223 (noting that victim's consent must result from reliance on deception). Thus, to prove that Demond was guilty as a party to Fuelberg's theft by deception, the State was required to show that the PEC would have potentially reined in or revoked Fuelberg's authority to hire outside consultants had the PEC known that its funds were being paid to Curtis and Price. There is no direct testimony to that effect, and thus the jury would have had to make some inferences about the PEC board's potential reaction to the deception.

In considering Demond's liability as a principal actor, there is evidence that his deceptive billing practices induced the PEC to unknowingly reimburse Clark Thomas for Curtis's salary and Price's retainer. *See Higginbotham v. State*, 356 S.W.3d 584, 589–90 (Tex. App.—Texarkana 2011, pet. ref'd) (concluding that evidence sufficient to prove theft by deception where contractor billed customer for expenses that contractor did not incur). As discussed above, Demond mislabeled Clark Thomas's bill for Curtis's salary as legal services even though Curtis was not a lawyer. Similarly, when Price began his retainer with Clark Thomas, Demond began adding a $7,000 line-item expense to Clark Thomas's bill to the PEC to cover both Curtis's salary and Price's retainer. There was testimony that because this block-billing did not identify what the PEC was paying for, it was impossible for the PEC to discover that these payments were being made for Curtis and Price. However, there is no direct testimony that if Clark Thomas's bills had accurately reflected that payments were being made to Curtis and Price, the PEC would not have consented to reimburse Clark Thomas for those payments.

Thus, we must consider whether there is sufficient circumstantial evidence from which the jury could infer that the PEC's decision to reimburse Clark Thomas for Curtis's and

27

Price's income was materially affected by Demond's deceptive billing. *See Daugherty*, 387 S.W.3d at 659 n.18. The record need not show that but for Demond's deception, the PEC would not have approved these payments. Rather, there must be sufficient evidence that the PEC would have considered the fact that these payments were going to Curtis and Price to be a "substantial and material factor" in determining whether the payments should be made. *See id.*

The PEC's assistant general manager testified that he approved several of the $30,000 payments to Clark Thomas that were each used to pay six months of Curtis's salary. The assistant manager stated that had he known that Clark Thomas was billing the PEC for Curtis's salary, he likely would have reported the matter first to Fuelberg, and then *potentially* to the PEC board of directors. Furthermore, the assistant general manager explained that if employees at the PEC had learned that Curtis was being paid as an outside consultant, "all hell would have broken loose" because employees might complain that Fuelberg was allowed to hire his relatives while other employees were not. This, according to the assistant manager, would have created a morale issue amongst PEC employees which would have become "an important consideration to management."

The three current and former PEC directors who testified at trial all stated that they would like to have known that Curtis and Price were being paid with PEC funds through Clark Thomas. According to these directors, although Fuelberg had the authority to hire outside consultants as he saw fit, given the general nepotism policy applicable to PEC employees, Fuelberg should have informed them of Curtis's and Price's status as outside consultants. One former director, Edwin Smith, stated that he was "pretty hot when he found out" that Fuelberg and Demond concealed Curtis's and Pirce's employment.

28

Although there was testimony that PEC employees would have reacted negatively to the revelation that Fuelberg authorized payments to Curtis and Price, there was no testimony that such morale issues would have prevented any PEC employee from authorizing these payments to Curtis and Price. Furthermore, although the PEC board members testified that they would like to have known that the PEC was indirectly paying Curtis's salary and Price's retainer, none of the directors testified that the board would have stepped in and blocked these payments. Similarly, none of the directors testified that had they known that Curtis and Price were being paid through Clark Thomas, they would have recommended that the PEC's nepotism policy be modified to cover outside consultants. Finally, no witness testified that had either the PEC's accounting department or board of directors known about these payments, they would have considered terminating Fuelberg's employment or reining in his authority.

Thus, we conclude that the evidence is insufficient to support a finding that either Demond's or Fuelberg's deception induced the PEC to make payments it otherwise would not have made. Although it is understandable that the PEC board wished that Demond or Fuelberg had been more forthcoming, that frustration, standing alone, is not sufficient to prove beyond a reasonable doubt that their deceptive conduct induced the PEC to pay Clark Thomas for Curtis's and Price's salaries. Because the State indicted Demond for theft by deception, it was limited to that theory of theft, and was required to prove that some deceptive act induced the PEC's consent.

Having failed to offer such proof, we conclude that the evidence is insufficient to support Demond's conviction for theft by deception. We therefore reverse and vacate Demond's conviction for theft by deception. Having vacated Demond's conviction for theft, we need not address Demond's double-jeopardy complaint.

29

*Proceeds of criminal activity*

In his fifth appellate issue, Demond asserts that the "State's theory of money laundering is incorrect as a matter of law." Specifically, Demond argues that even if the evidence is sufficient to establish that he misapplied the PEC's funds, that misapplication was not complete until the money was transferred to Curtis and Price. Therefore, according to Demond, the PEC's funds did not become "proceeds of criminal activity" within the meaning of the Penal Code until after those funds had already been transferred through Clark Thomas, and thus Demond's alleged transfer of funds from Clark Thomas to Curtis and Price could not constitute the transfer of proceeds of criminal activity.

Relevant here, a person commits money laundering if he knowingly "(1) acquires or maintains an interest in, conceals, possesses, or transfers . . . the proceeds of criminal activity or (2) conducts, supervises, or facilitates a transaction involving the proceeds of a criminal activity." Tex. Penal Code § 34.02(a)(1)–(2). "Criminal activity" is defined as any offense that is "classified as a felony under the laws of this state . . . ." *Id.* § 34.01(1)(A). "Proceeds" are "funds acquired or derived directly or indirectly from, produced through, realized through, or used in the commission of . . . an act." *Id.* § 34.01(4)(A). The predicate criminal activity alleged in the indictment is "misapplication of fiduciary property with an aggregate value of $100,000 or more." *See id.* § 34.02(e)(3) (classifying money laundering as second-degree felony if value of funds laundered more than $100,000 but less than $200,000). Therefore, the State was required to prove that Demond either (1) acquired or maintained an interest in, concealed, possessed, or transferred the proceeds of misapplication of fiduciary property or (2) conducted, supervised, or facilitated a transaction involving the proceeds of such a misapplication.

30

Demond contends, and the State appears to agree, that for purposes of the money-laundering statute, money does not become proceeds of criminal activity until the underlying criminal offense is complete. *See id.* § 34.01. The parties rely on federal cases interpreting the federal money-laundering statute for this assertion.[9] *See generally United States v. Harris*, 666 F.3d 905, 907–08 (5th Cir. 2012) (discussing cases in which appellate courts held that relevant funds were not proceeds of criminal activity before they were transferred); *see also* 18 U.S.C. §§ 1956–57 (defining federal money-laundering offense). We note, however, that although the Texas money-laundering statute and its federal counterpart contain similar provisions, they are not identical. *Compare* 18 U.S.C. §§ 1956–57, *with* Tex. Penal Code §§ 34.01–.02. Relevant here, the Texas money-laundering statute defines "criminal activity" as "any offense, including *any preparatory offense,*" that is classified as a felony. Tex. Penal Code § 34.01(1) (emphasis added). Furthermore, the Texas statute defines "proceeds" as "funds acquired or derived directly *or indirectly* from, produced through, realized through, *or used in the commission of*" a criminal activity. *Id.* § 34.01(4) (emphasis added). Given that the Texas money-laundering statute broadly defines (1) criminal activity to include inchoate crimes and (2) proceeds of criminal activity to include indirect gains and money used to assist in the commission of the criminal activity—neither of which is present in the federal statute—it is by no means clear that a predicate offense must be complete before it can create proceeds of criminal activity. However, because the parties do not dispute this issue and we can

---

[9] This Court and the court of criminal appeals have also looked to federal cases interpreting the federal money-laundering statute for guidance in applying Texas law. *See, e.g.*, *DeLay v. State*, __ S.W.3d __, 2014 WL 4843917, *8 n.55 (Tex. Crim. App. 2014); *DeLay v. State*, 410 S.W.3d 902, 914 (Tex. App.—Austin 2013), *aff'd*, 2014 WL 4843917, at *12.

31

resolve Demond's sufficiency complaint on other grounds, we will assume, without deciding, that the predicate misapplication of fiduciary property needed to be complete before Demond's alleged money laundering occurred.

To prove misapplication of fiduciary property, the State was required to show that Fuelberg (1) "failed to apply the funds according the terms of the agreement" under which they were held and (2) the misapplication created a substantial risk of loss to the PEC. *See Merryman v. State*, 391 S.W.3d 261, 270 (Tex. App.—San Antonio 2012, pet. ref'd). "The actual disposition of the money is *immaterial*, and the State is not required to prove how the fiduciary applied the funds 'if the State has proved that the fiduciary failed to apply the funds according to the terms of the agreement.'" *Skillern v. State*, 355 S.W.3d 262, 268–69 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (emphasis added) (quoting *Little v. State*, 699 S.W.2d 316, 318 (Tex. App.—San Antonio 1985, no pet.)); *see also Merryman*, 391 S.W.3d at 270 (same). Therefore, the State was not required to prove that the PEC's funds ultimately were received by Curtis and Price to establish misapplication, and the jury could have reasonably concluded that the misapplication of fiduciary property was complete when Fuelberg transferred the funds from the PEC to Clark Thomas. *See Merryman*, 391 S.W.3d at 270; *Skillern*, 355 S.W.3d at 268–69. Similarly, the jury could have reasonably concluded that the PEC's funds became proceeds of criminal activity when they were received by Clark Thomas, that Demond's subsequent transfer of those funds to Curtis and Price was a transaction involving the proceeds of criminal activity, and therefore that Demond was guilty of money laundering. *See* Tex. Penal Code § 34.02(a)(2).

This analysis is consistent with federal cases dealing with similar federal statutes. In *United States v. Allen*, 76 F.3d 1348, 1352–53 (5th Cir. 1996), a bank executive conspired to hire his business associates as consultants for the bank, pay the associates substantially more than their work would justify, and then have the associates "kickback" a portion of their consultant salaries to the executive. The executive and associates asserted that their misapplication of bank funds was not complete until the bank executive received his kickback and, therefore, none of the preceding transfers between the parties could constitute laundering of proceeds from that misapplication. *See id.* at 1360; *see also* 18 U.S.C. §§ 656 (misapplication of bank funds), 1956(a)(1)(B)(i) (money laundering).

The Fifth Circuit disagreed, concluding that the "[d]efendants' contentions fail because the funds at issue in each of the transactions became proceeds at the moment the money left the control of [the bank] and was deposited into the account of a consultant . . . ." *Allen*, 76 F.3d at 1361 (internal citation omitted). The subsequent transfer from a consultant's account to another bank account constituted the transfer of proceeds of the misapplication, and thus money laundering. *Id.* To illustrate the point that the misapplication was complete as soon as the bank lost control of its funds, the court used the following hypothetical:

> Suppose, for example, a consultant and a bank officer agree to an invoice and kickback scheme, but the consultant decides to cheat by keeping all the money and making no kickback. The two would have perpetrated a fraud against the bank. The bank officer in this example participated in the scheme by approving the invoice with intent to defraud. The dishonor among thieves is not relevant, certainly not to the bank.

*Id.*

Similarly here, Fuelberg committed misapplication of fiduciary property by authorizing payments to Clark Thomas to pay Curtis's salary and Price's retainer when he knew that the PEC was, at a minimum, overpaying for those services. Had Demond decided to cheat and not pay any of the PEC's money to Curtis and Price, either keeping it for himself or leaving it with Clark Thomas, the PEC's property still would have been misapplied, Fuelberg would still be guilty of misapplication of fiduciary property, and Demond would still be guilty as a party to Fuelberg's conduct.

Demond asserts that because the indictment alleges that he committed misapplication of fiduciary property "by making or causing payments to be made to" Curtis and Price, the State cannot now assert that the misapplication was complete when the PEC's property was transferred to Clark Thomas. Although Demond raises this issue as a sufficiency claim, the underlying argument may be more properly characterized as a material-variance issue similar to the party liability argument discussed above. *See generally Byrd*, 336 S.W.3d at 246 (discussing material variance). "[I]mmaterial variances are to be disregarded in the sufficiency of the evidence." *Id.* Therefore, if the allegation that the misapplication was committed by making payments to Curtis and Price is immaterial, then the State was not limited to that method of misapplication at trial, and the State could prove that the misapplication of fiduciary property was complete when the funds were transferred to Clark Thomas. *See id.*

There are three categories of variances: (1) "a variance involving statutory language that defines the offense," such as the theft-by-deception allegation discussed above; (2) "a variance involving a non-statutory allegation that describes an 'allowable unit of prosecution' element of an offense," such as misidentifying the name of a murder victim; and (3) "other types of variances

34

involving immaterial non-statutory allegations." *See Johnson v. State*, 364 S.W.3d 292, 298–99 (Tex. Crim. App.), *cert. denied*, 133 S.Ct. 536 (2012). The first category of variances is always material, and when an indictment alleges a specific statutory manner and means of committing an offense, then the State must prove that specific manner and means. *See, e.g.*, *Geick*, 349 S.W.3d at 547–48 (concluding that if indictment alleges theft by deception, State is limited to that theory of theft). The second category involves non-statutory allegations that are "descriptive of an element of the offense that defines or helps define the allowable unit of prosecution," such as the name of the victim in an assault case or the property that was stolen in a theft case. *See Johnson*, 364 S.W.3d at 297. A variance in this second category can be material if it is "significant enough that we could not conclude whether the State had proved the same" offense alleged in the indictment. *Id.*; *see also Byrd*, 336 S.W.3d at 256–57 (noting that theft of property belonging to store manager would be completely separate offense than theft of property belonging to store, and thus misidentifying who owned the property was material variance). The final category involves unnecessarily specific descriptions of elements of the offense that do not affect the allowable unit of prosecution, such as alleging that the defendant committed assault by hitting the victim when in fact the defendant slammed the victim against a wall. *See Johnson*, 364 S.W.3d at 298 (noting that act that caused the injury does not define or help define whether offense is separate assault). Variances in this final category are always immaterial, and therefore do not affect the sufficiency of the evidence. *See id.* at 298–99.

The variance at issue in this case clearly does not fit into the first category because how a person commits misapplication of fiduciary property does not involve a statutorily defined

35

manner and means of that offense. *Cf. Geick*, 349 S.W.3d at 547–48 (discussing how theft statute defines various ways that victim's consent can be ineffective). Similarly, the variance in this case is not descriptive of an element that defines or helps define the allowable unit of prosecution for misapplication of fiduciary property. *See Johnson*, 364 S.W.3d at 297. As discussed above, the actual disposition of fiduciary property is immaterial, "and the State is not required to prove how the fiduciary applied the funds." *Skillern*, 355 S.W.3d at 268–69. Rather, the State is required to show that the disposition of the property violated the fiduciary agreement under which it was held. *Id.* Thus, unlike the identity of the victim, the property allegedly misapplied, or the fiduciary agreement under which that property was held, the manner in which Demond misapplied the PEC's property is not descriptive of an element that helps define the allowable unit of prosecution for misapplication of fiduciary property, and therefore the variance at issue in this case does not fit within the second category of variances discussed above. *See Johnson*, 364 S.W.3d at 297 (noting that in theft prosecution, victim and property are two elements that affect unit of prosecution).

Therefore, we conclude that the indictment's allegation that Demond misapplied property by causing payments to be made to Curtis and Price is in the third category of variances—i.e., types of variances involving immaterial non-statutory allegations. *See id.* Similar to the manner in which an assailant causes his victim's bodily injury, the manner in which Demond misapplied the PEC's property does not affect the allowable unit of prosecution for this offense, and thus a variance between the indictment and the evidence adduced at trial on this issue is immaterial. *See id.* Therefore, in considering the sufficiency of the evidence to prove when the misapplication of fiduciary property was complete, neither the State nor the jury was limited to the disposition of

36

the PEC's property that was alleged in the indictment.[10]  *See Byrd*, 336 S.W.3d at 246 (noting that

immaterial variances do not affect sufficiency of evidence).

For the reasons stated above, we conclude that the evidence is sufficient to prove

that the misapplication of fiduciary property was complete when Fuelberg authorized PEC

funds to be transferred to Clark Thomas.  *See Merryman*, 391 S.W.3d at 270 (noting that actual

disposition of fiduciary property is immaterial in proof of misapplication of fiduciary property);

*Skillern*, 355 S.W.3d at 268–69 (same).  Although our conclusion is based on Texas precedent, it is

consistent with federal case law.  *See Allen*, 76 F.3d at 1361.  Thus, the PEC's funds became proceeds

of criminal activity when they were transferred to Clark Thomas, and the jury could have reasonably

concluded that Demond's subsequent transfer of those funds to Curtis and Price constituted money

laundering because it was a transaction involving the proceeds of criminal activity.  *See* Tex. Penal

Code 34.02(a)(2).  We overrule Demond's fifth issue on appeal.

**"Stacking" of jail time**

In his sixth appellate issue, Demond asserts that the trial court erred in ordering him

to submit to 500 days in jail as a condition of his community supervision.[11]  Demond cites to article

42.12, section 12(a) of the Code of Criminal Procedure, which provides that if "a judge having

---

[10]  Similarly, Demond's complaint that the jury charge did not assert that he committed misapplication of fiduciary property by making payments to Clark Thomas is without merit, as the State was not required to prove how Demond disposed of the PEC's property, but only that the property was applied in a manner that violated the fiduciary agreement under which it was held. *Skillern v. State*, 355 S.W.3d 262, 268–69 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd).

[11]  The conditions of community supervision state that Demond must submit to 140 days confinement for misapplication, 180 for theft, and 180 for money laundering, with the confinements to be served consecutively.

37

jurisdiction of a felony case requires as a condition of community supervision that the defendant submit to a period of confinement in a county jail, the period of confinement may not exceed 180 days." Demond argues that this provision means that a trial court cannot order a defendant to submit to more than 180 days confinement for any case, regardless of how many felony convictions arise out of that case. Therefore, according to Demond, the trial court abused its discretion in ordering him to submit to separate terms of confinement for each of his felony convictions.

The court of criminal appeals has specifically rejected this argument, concluding that article 42.12, section 12(a) authorizes terms of confinement of up to 180 days *per felony conviction*. *See Kesaria v. State*, 189 S.W.3d 279, 279 (Tex. Crim. App. 2006). Demond does not assert that there has been any intervening change in the statute or case law, but instead claims that the court of criminal appeals failed to properly analyze the statute. Even if we were to agree with Demond on this issue, we are bound to conform our opinions to those of the court of criminal appeals. *See State v. DeLay*, 208 S.W.3d 603, 607 (Tex. App.—Austin 2006), *aff'd sub. nom.*, *State v. Colyandro*, 233 S.W.3d 870 (Tex. Crim. App. 2007). Therefore, we overrule Demond's sixth issue on appeal.

However, because we have vacated Demond's conviction for theft by deception, Demond is no longer on community supervision for that offense. *See Kesaria*, 189 S.W.3d at 279 (concluding that trial court may order 180-day confinement as condition of community supervision for each felony conviction). Therefore, we modify the trial court's order imposing conditions of community supervision to delete the requirement that Demond submit to 180 days confinement for theft by deception. *See supra* n.11. As modified, we affirm the trial court's conditions of community supervision.

38

**Disqualification and recusal of Judge Mills**

In his seventh appellate issue, Demond asserts that as a PEC customer, Judge Mills (1) had a disqualifying pecuniary interest in this case, (2) had a disqualifying personal interest in this case, and (3) should have been recused because his impartiality might reasonably be questioned. These identical appellate issues were raised and fully addressed in this Court's two prior opinions concerning Fuelberg's appeal. *See Fuelberg v. State*, 410 S.W.3d 498, 502–507 (Tex. App.—Austin 2013, no pet.) (concluding Judge Mills did not have disqualifying pecuniary interest in this case); *Fuelberg v. State*, __ S.W.3d __, No. 03-11-00317-CR, 2014 WL 3558761, *3–8 (Tex. App.—Austin July 16, 2014, no pet. h.) (concluding Judge Mills not otherwise disqualified or required to be recused). We will not repeat that analysis here.

In this appeal, Demond adopted Fuelberg's appellate brief with regard to Judge Mills's recusal and disqualification in its entirety. For the reasons stated in our previous opinions, we conclude that Judge Mills was not disqualified and the assigned judge did not abuse his discretion in concluding that Judge Mills should not be recused. Therefore, we overrule Demond's seventh issue on appeal.

**Removal of seated juror**

In his eighth and final appellate issue, Demond asserts that the trial court abused its discretion by removing a juror as disabled when the juror complained of a bladder infection. Specifically, Demond asserts that the infection was only temporary and the juror stated that she might be able to return the following day. This temporary illness, according to Demond, is not the type of illness that would make a juror "disabled from sitting" for purposes of article 36.29 of the

Code of Criminal Procedure. Therefore, according to Demond, the trial court abused its discretion in concluding that the juror was disabled.

If a juror, "as determined by the judge, becomes disabled from sitting," the judge may remove the juror and allow the trial to proceed with fewer than twelve jurors. Tex. Code Crim. Proc. art. 36.29(a). "Disabled, as used [in article 36.29], means any condition that inhibits the juror from fully and fairly performing the functions of a juror." *Griffin v. State*, 486 S.W.2d 948, 951 (Tex. Crim. App. 1972). Such a condition can include "physical illness, mental condition, or emotional state which hinders one's ability to perform one's duties as a juror." *Landrum v. State*, 788 S.W.2d 577, 579 (Tex. Crim. App. 1990) (internal citations omitted); *see also Granados v. State*, 85 S.W.3d 217, 235 (Tex. Crim. App. 2002) (noting that juror's bias against defendant can make juror disabled if bias prevents juror from following court's instruction). "The determination as to whether a juror is disabled is within the discretion of the trial court." *Brooks v. State*, 990 S.W.2d 278, 286 (Tex. Crim. App. 1999). Therefore, we will only reverse the trial court's ruling if it is outside the zone of reasonable disagreement. *See id.*

Midway through the second day of trial, an empaneled juror notified the court that she was ill with what was "[p]robably some kind of bladder infection" that was causing her significant pain. The juror stated that she generally took "AZO" when this type of pain begins and that medication "is supposed to clear up a minor infection," meaning she could likely return to court the following day. However, the juror did not know if this was a minor infection and was not certain that she would be better the next day. Based on the juror's statements, the trial court found that the juror was "physically incapable of proceeding because of her pain" and, over Demond's objections, dismissed the juror as disabled.

40

Demond asserts that because the juror believed she could return to court the following day, the trial would likely only have been delayed for half of a day. This type of temporary illness, according to Demond, does not constitute the type of illness that would justify finding a juror disabled. This Court, however, along with several of our sister courts of appeals, has rejected the argument that a temporary illness does not constitute a disability. *See Moore v. State*, 82 S.W.3d 399, 406–07 (Tex. App.—Austin 2002, pet. ref'd) (concluding trial court did not abuse discretion by dismissing juror with temporary gastrointestinal issues), *overruled on other grounds by Taylor v. State*, 268 S.W.571, 588 (Tex. Crim. App. 2008); *see also Romero v. State*, 396 S.W.3d 136, 143–44 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (citing several appellate court decisions rejecting argument that temporary illness does not constitute disability). In *Moore*, we concluded that a trial court did not abuse its discretion in finding a juror was disabled based on the juror's "severe gastrointestinal ailment" because "although a stomach ailment is only temporary, it remains within the trial court's discretion to determine whether this juror" could no longer perform his functions. 82 S.W.3d at 407.

Demond does not cite to any cases in which an appellate court has concluded that a trial court abused its discretion by finding a juror to be disabled based on a temporary illness. Therefore, we adhere to our ruling in *Moore* and conclude that it is within the trial court's discretion to determine whether a temporary illness disables a juror. *See id.* Given that the juror in this case stated that her bladder infection caused her so much pain that she could not focus on the trial and that the juror was not certain that she would be able to return to court the next day, the trial court could have reasonably concluded that the juror's illness prevented her from performing her function as a

41

juror. Therefore, we cannot conclude that the trial court abused its discretion in finding that the juror was disabled. We overrule Demond's eighth issue on appeal.

## CONCLUSION

Having concluded that the evidence is insufficient to support Demond's conviction for theft by deception, we reverse and vacate the trial court's judgment of conviction for that offense. Similarly, we modify Demond's conditions of community supervision to delete the requirement that he submit to 180 days' confinement for theft by deception. Having overruled Demond's remaining appellate issues, we affirm the trial court's judgments of conviction in all other respects.

_____

Scott K. Field, Justice

Before Chief Justice Jones, Justice Pemberton and Field

Reversed and Vacated in Part; Modified and, as Modified, Affirmed in Part

Filed: November 21, 2014

Publish

# TAB B

# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-11-00553-CR

**Walter Demond, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BLANCO COUNTY, 424TH JUDICIAL DISTRICT
### NO. CR-1016, HONORABLE DANIEL H. MILLS, JUDGE PRESIDING

### O R D E R

**PER CURIAM**

We abated this appeal and remanded this cause for a new hearing, with instructions to address whether, under an objective reasonable-person standard, the Honorable Judge Daniel H. Mills (1) was disqualified as an injured party from hearing this case or (2) should have been recused because his impartiality might reasonably be questioned. *See Demond v. State*, No. 03-11-00553-CR, 2013 WL 4822904, at *2 (Tex. App.—Austin Aug. 27, 2013, no pet.). The district court has since filed a supplemental clerk's record with an order concluding that Judge Mills was not disqualified and should not have been recused. This appeal is reinstated.

We request supplemental briefings from the parties on the limited issue of whether the district court erred in concluding that Judge Mills should not have been disqualified or recused.

The appellant should file his brief no later than February 6, 2014. The State's response will be due within thirty (30) days of the filing of the appellant's brief.

It is so ordered this 7th day of January 2014.

Before Chief Justice Jones, Justices Pemberton and Field

Do Not Publish

# TAB C

# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
## NO. 03-11-00553-CR
---

**Walter Demond, Appellant**

**v.**

**The State of Texas, Appellee**

---
### FROM THE DISTRICT COURT OF BLANCO COUNTY, 424TH JUDICIAL DISTRICT
### NO. CR-1016, HONORABLE DANIEL H. MILLS, JUDGE PRESIDING
---

## M E M O R A N D U M   O P I N I O N

A jury found appellant Walter Demond guilty of misapplication of fiduciary property, theft, and money laundering. *See* Tex. Penal Code §§ 31.03, 32.45, 34.02. The jury assessed punishment at ten years' imprisonment for each offense, but recommended that the sentences be suspended and Demond be placed on community supervision. Among his several appellate issues, Demond asserts that (1) the trial judge, the Honorable Daniel H. Mills, was disqualified from the case and (2) the assigned judge erred in failing to recuse Judge Mills.[1] We will abate and remand this appeal.

The factual background of this case is discussed in this Court's opinion in *Fuelberg v. State*, __ S.W.3d __, No. 03-11-003147-CR (Tex. App.—Austin Aug. 27, 2013, no pet. h.), and

---

[1] Demond also asserts, among other things, that the evidence is insufficient to support his convictions, his convictions violate the prohibition against double jeopardy, and the terms of his community supervision are invalid.

will not be fully repeated here. The State alleged that between November 1996 and March 2007, Bennie Fuelberg, the general manager of the Pedernales Electric Cooperative (PEC), conspired with Demond to funnel over $200,000 in PEC funds through Demond's law firm to Fuelberg's brother and the son of a former PEC board member.

Prior to trial, Fuelberg and Demond filed identical motions to disqualify or, alternatively, recuse Judge Mills from their respective cases. The motions asserted that as a PEC member, Judge Mills had a financial interest in the outcome of the trial and was a putative victim of the alleged offenses. Following a brief discussion with the parties, Judge Mills declined to voluntarily recuse himself and referred the motions to the presiding judge, who assigned the motions to the Honorable Bert Richardson. *See* Tex. R. Civ. P. 18a (prescribing procedure for resolving motions to disqualify and recuse).[2] Judge Richardson conducted a hearing, after which he denied Fuelberg's and Demond's motions. Fuelberg and Demond filed petitions for writ of mandamus, seeking orders from this Court directing Judge Richardson to reverse his rulings. This Court denied the mandamus petitions. *See In re Demond*, No. 03-10-00024-CV, 2010 Tex. App. LEXIS 1256, at *2–4 (Tex. App.—Austin Feb. 19, 2010, orig. proceeding [leave denied]) (mem. op.).

In this direct appeal, Demond asserts that Judge Mills was disqualified and should have been recused because he had a financial interest in this case and is a putative victim of the offenses alleged. These appellate issues and the arguments made are identical to those raised and addressed in *Fuelberg*, __ S.W.3d at __, No. 03-11-00317-CR, issued this date. In that opinion, we

---

[2] Although Fuelberg and Demond were tried separately, they filed identical motions to disqualify and recuse Judge Mills, and Judge Richardson conducted a single hearing for both Fuelberg's and Demond's motions.

2

concluded that Judge Mills did not have a disqualifying pecuniary interest in Fuelberg's case. However, we also concluded that Judge Richardson erred in failing to apply an objective reasonable-person standard to the issues of whether (1) Judge Mills was disqualified as a "party injured" under article 30.01 of the Code of Criminal Procedure and (2) Judge Mills should have been recused because his impartiality might reasonably be questioned. *See Whitehead v. State*, 273 S.W.3d 285, 286 (Tex. Crim. App. 2008); *Ex parte Ellis*, 275 S.W.3d 109, 115–17 (Tex. App.—Austin 2008, no pet.). We do not repeat that discussion here. The record and arguments in this case are identical to those in *Fuelberg* with respect to the disqualification and recusal issues.

For the reasons stated in our opinion in *Fuelberg*, we overrule Demond's complaint that Judge Mills was disqualified based on his alleged pecuniary interest in the subject-matter of this case. We abate this appeal and remand this cause for a new hearing, with instructions to address whether, under an objective reasonable-person standard, Judge Mills (1) was disqualified as an interested party, *see Whitehead*, 273 S.W.3d at 286, or (2) should have been recused because his impartiality might reasonably be questioned, *see* Tex. R. Civ. P. 18b(b)(1).[3]

The district court shall submit to this Court its findings and conclusions, along with a transcription of the hearing, in a supplemental clerk's record and reporter's record on or before October 28, 2013. At that time, we may request additional briefing from the parties as necessary.

---

[3] Because we are abating this appeal and remanding this case for a new disqualification and recusal hearing, we need not reach Demond's remaining appellate issues at this time. *See* Tex. R. App. P. 47.1 (requiring appellate courts to hand down opinions that are as brief as possible while addressing those issues necessary to final disposition of appeal)**.**

3

_____

Scott K. Field, Justice

Before Chief Justice Jones, Justices Pemberton, and Field

Abated

Filed:   August 27, 2013

Do Not Publish