# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-22-00710-CR

**Marcus Johannsan Mitchell, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 26TH DISTRICT COURT OF WILLIAMSON COUNTY
### NO. 19-0501-K26, THE HONORABLE DONNA GAYLE KING, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Marcus Johannsan Mitchell of theft of property valued at between $30,000 and $150,000 and sentenced him to ten years' imprisonment. On appeal, he argues that the evidence was insufficient to support the conviction and that the trial court abused its discretion in allowing the State to introduce evidence of two extraneous offenses. We affirm the judgment of conviction.

### SUMMARY OF THE EVIDENCE

On December 7, 2018, a UPS driver reported that a Helzberg Diamonds store had not received an expected package and that he could not find the package on his truck. Appellant worked at the UPS facility as a seasonal worker and had been assigned to load trucks, including the truck that was supposed to deliver the package. Appellant never returned to work at UPS after the day the package went missing, and police found that several of the missing items of

jewelry had been pawned in late December. Surveillance video and records from the pawn shops showed that appellant had pawned the jewelry.

Michael Akroosh testified that he was the driver of a UPS truck that delivered to Lakeline Mall, where the Helzberg Diamonds store is located, and that he had driven that route for fifteen years. Akroosh explained that "preloaders" sort and load packages onto the trucks, "mak[ing] sure they get in the right trucks. So they handle all the packages getting onto our vehicles." In December 2018, UPS was using a temporary loading facility while a new facility was being built. The temporary facility was "not gated in," and Akroosh said that although workers were supposed to enter and exit through a particular entrance, which has metal detectors and security guards, there were other doors, which he did not think were alarmed.

On December 7, when Akroosh made his deliveries to Helzberg Diamonds, he was informed that "they were missing a couple of packages." He and another driver who was assisting him that day looked through the truck and did not find the package but found "a piece of a UPS box" that "looked like a box [Helzberg] would use," up near the driver's compartment. He clarified that the piece of cardboard did not have any identifying information on it and looked like "the type of box any other customer would use." Akroosh called his supervisor, James Shipp, to report the missing package, and Shipp in turn contacted UPS security. Akroosh testified that he had worked for UPS for twenty-three years and had never had another situation where a package went missing.

Shipp testified about the temporary "satellite facility," explaining that employees were supposed to use a designated door, which had metal detectors and security personnel, to enter and exit the facility. There were also emergency doors and two bay doors leading to truck ramps. Employees could not come in through the alternative doors, "but you could exit the

2

building. And people were [seen] walking out the bay doors as well as the back doors." Shipp described the preloading process, saying that a conveyor belt would send packages down and that about twenty preloaders, ten on each side of the belt, would load the trucks. Shipp testified that UPS trucks are loaded to make deliveries easier with the first deliveries placed closest to the rear door of the truck and later deliveries placed closer to the driver's compartment. Shipp said that after Akroosh reported the missing package, he relayed the report to Kevin Casey, the facility's security supervisor.

Casey testified about the UPS scanning system, saying that when packages arrive at the sorting facility, they receive a "Destination Scan" and an "SPA label," which has "the bay number and where within the truck it needs to be loaded." After a package is scanned into the facility and placed onto a conveyor belt, it moves into the "sort aisle," where "one of probably ten employees would look at the SPA label" and then place it onto one of three belts that would send it to the area where the trucks are waiting to be loaded.

Casey testified that Shipp had contacted him on December 7 to report the missing package and that later that day, he was informed that Akroosh had found "a partially ripped-up UPS Express box inside of the vehicle." Because that piece of box lacked identifying markers, Casey "could not confirm it was, in fact, the missing package." Casey searched the loading facility to see if the package had been left behind or had fallen out but did not find it. Casey then accessed UPS's records for the package, which showed that the package was last scanned at 6:07 a.m., receiving a "Destination Scan," meaning "that that package is physically confirmed and has been physically scanned" at the loading facility and should have been placed on the truck. The preloaders for Akroosh's truck were Dylan Page and appellant. Appellant was loading the truck "for the entirety of the sort," which Casey thought took about six or seven

3

hours, and Page joined Mitchell loading the truck for the final thirty minutes of Mitchell's shift. Appellant worked from 1:00 a.m. until 8:28 a.m. on the day the package went missing. Page worked from 1:22 a.m. until 9:21 a.m., and Casey agreed that there was a period of time after appellant finished work when Page was working alone on the vehicle.

Casey said that the loading facility had surveillance cameras that showed an "overview with—of the outside of the vehicle"; there were no cameras set up to watch the inside of the truck while it was being loaded. Casey watched the eight hours of surveillance video of appellant loading the truck and did not "see anything visible on camera that was innately suspicious." He also viewed surveillance video of both Page and appellant leaving the facility for the day, using the main exit, and did not see anything suspicious. Casey said that the loading facility "didn't have the same level of security because it was a temporary facility." He testified that the designated entrance/exit door had two security guards and a metal detector and that employees were not supposed to bring in "anything that they could conceal items in," like coolers or backpacks, "but they often did."

Casey investigated appellant, Page, Akroosh, and the other driver who had been with Akroosh on his route the day the package disappeared. He testified that he ruled out Page, Akroosh, and the other driver, explaining that all three of those men continued to come to work and did not exhibit any suspicious behavior. Appellant, on the other hand, never returned to work at the facility and did not call to say he would not be returning. Further, he agreed that "Mitchell was not just not showing up to work. It was a no-call no-show." Casey said, "Oftentime[s] through my experience . . . when we experience a loss[,] subjects would not return back to work the day after an incident occurred." Casey also placed "a little covert camera or hidden camera and arranged it in a way to look inside of the vehicle" to see if he saw "any

4

additional suspicious activity or . . . any other packages going missing in the future," but there were "no additional losses or any suspicious activity on the vehicle." Casey testified that after two to three weeks of no losses and no suspicious activity recorded on the hidden cameras, Page continuing to work with no signs of suspicious conduct, and appellant "continuing to not show up to work," he filed a report with the Round Rock Police Department.

Casey was asked on cross-examination about how often packages disappear from the UPS system, and he said that in his experience, "a few hundred to a thousand" packages might go missing from a loading facility in a month. UPS does not investigate all of those disappearances, focusing only on the high-value losses, "[g]enerally, anything over a thousand dollars plus." He thought only one or two of those losses would be reported to the police.

After appellant elicited that testimony, the State argued that appellant had opened the door for questioning about three other low-value packages appellant was believed to have stolen on December 6 and 7. The trial court held a hearing, in which Casey explained that after UPS learned about the missing Helzberg shipment, they were also informed about two shipments that were supposed to be delivered to Kay Jewelers at Lakeline Mall that same day and one that was supposed to have been delivered to Helzberg Diamonds the day before. The State argued that evidence about those other packages "shows a lack of mistake, it shows intent, and it also shows a continuing course of criminal activity by" appellant. The State argued that the evidence was relevant because all three packages were to jewelry stores and because Casey "considered them as part of his investigation." The trial court ruled that it would allow evidence about the Kay Jewelers packages because they were "relevant circumstantially" and their relevance was not substantially outweighed by the danger of unfair prejudice. It barred the State from asking about the December 6 Helzberg package because the State could not establish that appellant,

5

who had been working that day, had been assigned to load the truck that was supposed to deliver it.

When the jury returned, Casey testified that during his investigation, he learned about two other missing packages that were supposed to be delivered to Kay Jewelers on December 7 by the same truck. He told the jury that he believed that the fact that they were addressed to a jewelry store was relevant because, "just looking at trends, which is something we often do, . . . when you have three packages going missing for a jewelry store, we don't really believe it's a coincidence at that point." Those two packages and the one to Helzberg Diamonds were the only packages missing from the truck to Lakeline Mall that day. Casey testified that the Helzberg package was worth between $30,000 and $33,000 based on an invoice provided by the jewelry store. Casey conceded that numerous people would have handled the missing package after it arrived at the sorting facility and that during the busy holiday season, there were "over a hundred employees, a hundred preloaders and sorters and other positions."

Dylan Page testified that he was a seasonal worker for UPS for about two months in the winter of December 2018. He and two or three other people would load trucks to go to malls in Austin, including Lakeline Mall. He testified that he was never questioned about any packages that were missing from Helzberg Diamonds and that he did not remember appellant from the time they worked together. He said that the job was "like me like in one chute. . . . So it was really just me. . . . I don't even remember—really remember anyone there besides this one super large dude." Page said he worked alone at his chute for most of his shifts, helping other preloaders at the end of a shift if someone "couldn't get it done in their chutes and whatnot." Page testified that he never stole any packages from UPS during his employment there.

6

Dean Peterson was a detective with the Round Rock Police Department in December 2018. He started the investigation with a list of three names and searched their names in a database called LeadsOnline, which he described as follows:

> Pawnshops use this to take in the merchandise that they buy, and then it's—it's like a portal. So they enter DeWalt piece of equipment, right? They enter a DeWalt sawzall serial number and they put it in, and then law enforcement is able to see who pawned that DeWalt sawzall. But in this case it was jewelry.

When Peterson entered appellant's name into LeadsOnline, he found that appellant had pawned four items of jewelry at one pawnshop in Austin on December 26, 2018. Several days later, another search showed that appellant had pawned two more pieces of jewelry at another pawnshop, this one in Round Rock, and on January 9, 2019, the manager of the first shop called Peterson to report that appellant was "back in the store trying to pawn some more jewelry." Peterson recovered the six pieces of jewelry from the two pawnshops and met with a Helzberg Diamonds representative to verify that the jewelry was "part of the shipment of jewelry that was stolen from the UPS facility." In addition, another detective obtained video footage from one of the pawnshops showing appellant pawning the items. Peterson testified that he found it suspicious that appellant traveled from his home in Hutto to two different pawnshops—one on 183 in Austin and one in Round Rock—to pawn jewelry and that he never returned to work or even called in after the items went missing. Peterson contacted appellant, who came in for an interview, but no evidence was introduced about any explanation appellant might have provided to explain his possession of the items he had pawned.[1]

---

[1] During opening statements, defense counsel started to discuss the statements appellant made in his interview with Peterson, but the State raised a hearsay objection, stating that it was not going to offer appellant's statement into evidence. The trial court said, "So just skip that part

According to Helzberg Diamonds' bill of lading for the shipment, the jewelry that was stolen—121 pieces in all—was valued at $37,259.86. Peterson testified that none of the other missing pieces were recovered. He believed that appellant "had them in his possession and got rid of them some other way besides at a pawnshop."

Jessica Smith is a regional loss prevention manager for Helzberg Diamonds. She testified about the process of identifying which items were lost, how they could tell that the items recovered from the pawnshops were from the missing package, and how Helzberg prices their pieces. She testified that packages probably go missing "a couple times a month." She also explained that Helzberg does not use its full name on its shipping labels, instead addressing their packages to "HDS."

Judy Richey was the manager of a Cash America pawnshop in December 2018. She testified that when someone pawns or sells an item, they are required by Texas law to show a valid picture ID, like a driver's license or a passport. The pawnshop also enters descriptions of the customer into its company-wide database, along with the customer's address, and descriptive information about the item being pawned. Richey explained how pawnshops and law enforcement use the LeadsOnline system and said that if a customer is flagged as selling a potentially stolen item, the pawnshop puts a block on their account and lets law enforcement know if that customer returns to try to sell more items. Richey testified that the store's records show that appellant sold four pieces of jewelry to the shop on December 26, 2018.

---

for now," and defense counsel proceeded with opening arguments without summarizing what appellant said in his interview. Later, when Peterson testified, there was a discussion at the bench about what appellant said in his interview, but the parties did not introduce any details into evidence, such as through a video of the interview or a written statement summarizing appellant's interview.

## SUFFICIENCY OF THE EVIDENCE

In his first issue, appellant argues that the evidence was insufficient to prove that he unlawfully appropriated the jewelry with the intent to deprive the owner, an element of the offense of theft, because the State did not establish how he came to have the jewelry. *See* Tex. Penal Code § 31.03. Appellant argues that the State did not prove that he had handled the package, that the UPS surveillance video did not show him behaving suspiciously, and that he voluntarily interviewed with Detective Peterson and did not make any incriminating statements and, therefore, that "the jury had no evidentiary basis for determining how" appellant acquired the jewelry. He hypothesizes that, for example, "the actual thief could have torn open the package and attempted to leave the facility with all 121 pieces, while accidentally dropping six of those pieces," and that "[i]f Appellant found those six pieces in such a situation, he would simply be exercising control over abandoned property, which would preclude a finding that Appellant intended to deprive an owner of property (*i.e.*, abandoned property has no owner)."

In considering the sufficiency of the evidence, we ask whether a reasonable juror could have found each element of a criminal offense beyond a reasonable doubt, deferring to the jury's determinations as to witness credibility, the weight to be given to the evidence, and the resolution of any evidentiary conflicts. *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). This standard accounts for the factfinder's duty "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Clayton*, 235 S.W.3d at 778. We consider all the evidence the jury was allowed to consider, regardless of whether it was rightly or wrongly admitted; view that evidence in the light most favorable to the verdict; and presume that the jury resolved conflicting inferences and issues of credibility in favor of its

9

verdict. *Id.*; *Demond v. State*, 452 S.W.3d 435, 445 (Tex. App.—Austin 2014, pet. ref'd). We will not overturn a verdict unless we determine that it is irrational or not supported by proof beyond a reasonable doubt. *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

In considering the evidence, the jury may reasonably infer facts from the evidence, credit the witnesses as it chooses, disbelieve any evidence or testimony proffered, and weigh the evidence as it sees fit. *Mottin v. State*, 634 S.W.3d 761, 765 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd). Our role is to ensure that "the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). Direct and circumstantial evidence are treated equally, and "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Clayton*, 235 S.W.3d at 778 (quoting *Hooper*, 214 S.W.3d at 13).

"[R]ecent, unexplained possession of stolen property is a sufficient circumstance, in and of itself, to convict the possessor of stolen property of the theft of the property" if "such possession was personal, recent, unexplained, and involved a distinct and conscious assertion of the property by the defendant." *Sutherlin v. State*, 682 S.W.2d 546, 549 (Tex. Crim. App. 1984) (en banc); *see Rollerson v. State*, 227 S.W.3d 718, 725 (Tex. Crim. App. 2007) (noting "well-settled rule" that defendant's unexplained possession of recently stolen property permits inference that defendant committed burglary); *Poncio v. State*, 185 S.W.3d 904, 905 (Tex. Crim. App. 2006) ("a defendant's unexplained possession of property recently stolen in a burglary permits an inference that the defendant is the one who committed the burglary"); *Chavez v. State*, 843 S.W.2d 586, 588 (Tex. Crim. App. 1992) (en banc) ("evidence sufficient to show an accused exercised control over property without consent of the owner, intending to deprive him of it, is

always enough to prove theft"; "[u]nexplained possession of recently stolen property also establishes the offense").

In late December, a few weeks after the package disappeared, appellant pawned six of the items from the missing package, thus asserting his ownership of them, and then attempted to pawn additional items about two weeks later. No explanation for how he came to be in possession of the jewelry was offered into evidence.[2] In addition to appellant's recent, unexplained possession of some of the stolen items, which alone could support a finding of guilt, *see Poncio*, 185 S.W.3d at 905; *Chavez*, 843 S.W.2d at 588, the State presented evidence that appellant was working at the UPS facility on the day the package disappeared, that he was responsible for loading the delivery truck that was supposed to deliver the package to Helzberg Diamonds, and that he failed to return to work the day after the package disappeared or even call to explain that he would be absent, a circumstance Peterson and Casey found suspicious. *See Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007) (noting that "[e]vidence of flight evinces a consciousness of guilt"). We hold that the evidence is sufficient to support the verdict. We overrule appellant's first issue.

---

[2] Even if defense counsel's closing argument—proffering as a possibility that "the actual thief might have had [the stolen jewelry] in his pockets and when he was walking out to his car, he might have pulled his keys out and a few pieces comes out with it," at which point appellant found it—could be viewed as appellant having offered an explanation for his possession, it was up to the jury to decide whether that explanation was true or reasonable, and the jury was entitled to reject the explanation as false, unreasonable, or not credible, given the other circumstantial evidence surrounding the theft. *See Mottin v. State*, 634 S.W.3d 761, 769 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd).

## EVIDENCE OF OTHER THEFTS

In his second issue, appellant argues that the trial court abused its discretion in allowing the State to present evidence about the two packages intended for Kay Jewelers that disappeared from the UPS facility on the same day and that were assigned to the same truck.

The Texas Rules of Evidence bar the admission of evidence of other crimes or bad acts to "prove the character of a person in order to show action in conformity therewith," but extraneous-offense evidence may be admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident, Tex. R. Evid. 404(b)(2), and those exceptions "are neither mutually exclusive nor collectively exhaustive," *De La Paz v. State*, 279 S.W.3d 336, 342-43 (Tex. Crim. App. 2009). "Rule 404(b) is a rule of inclusion rather than exclusion," and it only excludes "evidence that is offered (or will be used) solely for the purpose of proving bad character and hence conduct in conformity with that bad character." *Id.* at 343 (quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)). The party seeking to admit evidence of uncharged misconduct need not match "a given set of facts into one of the laundry-list exceptions set out in Rule 404(b)" but must be able to show "logical and legal rationales that support its admission on a basis other than 'bad character' or propensity purpose." *Id.*

"Whether extraneous offense evidence has relevance apart from character conformity, as required by Rule 404(b), is a question for the trial court." *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). We review a trial court's ruling on the admissibility of extraneous offense for an abuse of discretion, meaning that we will uphold the ruling if it falls within the zone of reasonable disagreement. *Id.* at 343-44.

The State provided testimony that only two other packages went missing from Akroosh's truck on December 7, that both were also addressed to a jewelry store, and that both

were also sent down appellant's chute for loading onto the truck. *See Tanash v. State*, 468 S.W.3d 772, 775 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (explaining that "evidence that the defendant previously has participated in recent transactions other than, but similar to, that on which the prosecution is based is admissible for the purpose of showing knowledge or intent"). Further, the State did not seek to introduce evidence about those other packages until after appellant questioned Casey about how many packages disappeared from the UPS facility and how often those disappearances were investigated. *See Castillo v. State*, 865 S.W.2d 89, 92 (Tex. App.—Corpus Christi–Edinburg 1993, no pet.) (explaining that "[e]xtraneous offense evidence is admissible to rebut a defensive theory" and "[e]xtraneous theft offenses are relevant to show the actor's intent to deprive another of property"). And finally, we note that the trial court was very careful in its consideration of what evidence it would admit, barring the State from eliciting testimony about another package addressed to Helzberg Diamonds[3] that disappeared the day before because the State could not establish with certainty that appellant had been the person loading the truck that day. We hold that the trial court did not abuse its discretion in determining that the evidence about the missing Kay Jewelers packages was admissible to prove lack of accident, plan, opportunity, and intent. We overrule appellant's second issue.

## CONCLUSION

Having overruled both of appellant's issues, we affirm the trial court's judgment of conviction.

_____

Darlene Byrne, Chief Justice

---

[3] The December 6 Helzberg package contained display stands and had little value.

13

Before Chief Justice Byrne, Justices Kelly and Theofanis

Affirmed

Filed: July 31, 2024

Do Not Publish